UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

IN RE: )
)
PLASTIC TECHNOLOGIES OF VERMONT, INC. ) Case No. 13-10729- cab
) *Chapter 11 case*
Debtor in Possession. )
_____

IN RE: )
)
PLASTIC TECHNOLOGIES OF MARYLAND, INC. ) Case No. 13-10730- cab
) *Chapter 11 case*
Debtor in Possession. )
_____

IN RE: )
)
PLASTIC TECHNOLOGIES OF NEW YORK, LLC ) Case No. 13-10731- cab
) *Chapter 11 case*
Debtor in Possession. )

*Pending Joint Administration*

**DEBTORS' MOTION FOR ORDER (I) APPROVING BIDDING PROCEDURES FOR PROPOSED SALE OF SUBSTANTIALLY ALL DEBTORS' ASSETS, (II) APPROVING BREAK-UP FEE, (III) APPROVING RELATED NOTICES, (IV) SCHEDULING AN AUCTION (V) ESTABLISHING ASSUMPTION AND ASSIGNMENT PROCEDURES FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (VI) SCHEDULING A SALE HEARING FOR APPROVAL OF (A) SALE OF SUBSTANTIALLY ALL DEBTORS' ASSETS TO STALKING HORSE OR OTHER SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) ASSIGNMENT AND ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

Plastic Technologies of Vermont, Inc., Plastic Technologies of Maryland, Inc., and Plastic Technologies of New York, LLC (collectively, "Debtors" or "Sellers") file this motion (the "Motion") seeking entry of an order, in the form attached hereto as **Exhibit A** (the "Bidding Procedures Order"): (i) approving bidding procedures for sale of substantially all of Debtors' assets (the "Sale"); (ii) approving payment of a break-up fee to Consolidated Container

Company LP ("Stalking Horse" or "Purchaser"); (iii) approving the form of proposed notices; (iv) scheduling an auction (the "Auction"); (v) establishing assumption and assignment procedures for executory contracts and unexpired leases; and (vi) scheduling a further hearing to consider (a) approval of the Sale to Stalking Horse pursuant to an "Asset Purchase Agreement" with Debtors (the "Stalking Horse APA") and (b) assumption and assignment of executory contracts and unexpired leases.  In support of this Motion, Debtors show as follows:

## I.      PRELIMINARY STATEMENT

Debtors' primary business is the manufacture of plastic bottles, detailed further in Debtors' affidavit in support of first day pleadings.   As described therein and below, continued financial constraints on Debtors' business necessitates Debtors' sale of substantially all of their assets.

Competitors in the plastic packaging industry distinguish themselves by offering customers, among other things, (1) unique product designs and (2) reliable, uninterrupted supply of products.  Each of those offerings is relevant to the sale of Debtors' assets and the value to be obtained by a purchaser from acquiring such assets.

First, because companies that purchase plastic bottles seek unique packaging for their brands, Debtors' manufacturing equipment is, in part, uniquely designed for their customers. This tailored service has provided Debtors with a competitive advantage in its region, since competitors would have to make significant investments of capital and resources to offer the same services to Debtors' customers.  However, in the context of an asset sale, the uniqueness of Debtors' assets limits Debtors' ability to find potential purchasers of the assets.  Although a buyer could redeploy Debtors' assets by investing in modifications to the equipment, Debtors' assets are attractive to a buyer primarily as a means to continuing supply to Debtors' existing

customers.  Indeed, the Stalking Horse APA includes assumption of contracts with Debtors' key customers.  An investor cannot realize adequate value from Debtors' assets by procuring new customers; the return on investment comes primarily from retaining Debtors' existing customers.

Debtors' customers are already seeking alternate supply arrangements and may not remain with Debtors for another month.  Word has spread throughout the plastic packaging industry that Debtors are facing severe financial issues.  The majority of Debtors' suppliers placed Debtors on cash in advance terms prepetition.  Debtors' representatives have confirmed with multiple persons in the industry that Debtors' customers have made inquiries of competitors.  In short, although Debtors' retention of existing customers through an asset sale  is critical to obtaining the highest value for those assets, it appears that such retention is already in jeopardy.

Second, Debtors have built customer relationships on the basis of their ability to offer uninterrupted supply to their customers.  This ability is now in jeopardy.  While some of Debtors'  customers are parties to executory contracts with Debtors and, thus, under Title 11 of the United States Code (the "Bankruptcy Code"), are required to continue performing under those contracts regardless of the Sale timing, the reality is that these customers cannot shoulder the economic consequences of a supply interruption.  In connection with Debtors' request to use cash collateral (in a separate motion), Debtors' believe they will be able to maintain operations until the anticipated closing of the Sale and will not force supply interruptions on their customers.  Debtors are less confident cash collateral usage will be sufficient to maintain operations beyond the proposed sale date.  The fear of supply interruptions is already creating significant concerns for Debtors' customers who, as noted, are actively seeking alternate supply sources.  For this reason as well, the sooner Debtors are able to consummate a sale of the assets,

the greater the likelihood a purchaser of the assets will be able to retain Debtors' customers and realize value from the purchase.

Finally, having an intact employee base capable of operating Debtors' machinery is critically important to any purchaser of the assets. The uncertainty facing Debtors' continued operations has impacted employee morale. The passage of time before a sale is completed increases the risk of employees' departure and thus lessens the attractiveness of the assets to a purchaser. If Debtors do not consummate a sale of the assets to a competitor such as Stalking Horse, Debtors' employees then face the risk of being unable to find alternate employment. In other words, closing a transaction quickly will result in greater job security for employees and a greater ability to operate the assets for the purchaser. In the smaller communities in which Debtors' operate, the loss of Debtors' approximately 70 employees is a loss for those entire communities.

The Stalking Horse APA establishes a cash purchase price ($2,400,000), which is in line with what Debtors, based on years of industry experience, and their secured lender believes to be the highest value for the assets. Like Debtors, Stalking Horse is engaged in the plastic packaging industry and has the industry knowledge and resources to continue Debtors' operations and employment of Debtors' employees.

Because of the timing concerns outlined above, the Stalking Horse APA sets certain deadlines for bidding, auction and Sale - Debtors seek a hearing on this Motion on October 22, 2013, and a sale hearing to consider the results of the auction on November 19, 2013. Without an expedited sale, Debtors will be left incurring administrative expenses to litigate Bankruptcy Code violations, but will not add value to Debtors' estate during such time period. To the contrary, Debtors will likely lose any interest from potential purchasers, will lose key customers,

will lose employees and will face a tightening of restrictions from suppliers.  Thus, Debtors

believe it is imperative that the Sale not only be approved, but also proceed in accordance with

the timeline requested herein.

## II.    DEBTORS' MARKETING PROCESS

1.      Approximately three months prior to Debtors' bankruptcy filing, Debtors engaged

Donald Moore to market their assets in light of their difficult financial circumstances.  Mr.

Moore is a Managing Director of HT Capital Advisors, LLC, a New York based investment

banking firm specializing in small and middle market companies.  As a long-time advisor to

Debtors, Mr. Moore was intimately familiar with the functions and details of Debtors' business.

2.      Mr. Moore's assignment was to find a strategic industry acquirer of Debtors'

assets and to do so in concert with Debtors' senior lender, Centrix Bank.   With Mr. Moore's

assistance, Debtors' management surveyed the industry landscape to identify appropriate

candidates and made discreet inquiries to a large number of companies to test strategic fit and

interest level; further narrowing the target list.  The target list was comprised of companies

determined to be the best strategic fit in relation to geography, markets, manufacturing

capabilities, etc. and one company that previously had approached Debtors' owner regarding

acquisition of Debtors' assets.

3.      A formal presentation for sale of Debtors' assets was prepared and presented to

three solidly financed, major industry corporations that provided Debtors' with financial

disclosures and executed non-disclosure agreements.  These presentations included tours of

Debtors' facilities and, later, preliminary due diligence investigation.

4.      The net result of this activity was that valuations confirmed the value of Debtors'

assets, at best, was below Debtors' accrued debt.  Debtors received two offers of interest, with

Stalking Horse's offer being the only offer Debtors' considered viable.   An informal offer received from another company required sale through a prepackaged bankruptcy that Debtors did not have the resources to undertake.  Stalking Horse exhibited the most interest, the best strategic fit and, by far, the most resources and expertise to participate in a Section 363 sale.

5.        Due to Debtors' deteriorating financial condition, and time constraints in closing a sale, discussed above, Debtors' management, with the support of their secured lender, determined that it was appropriate to immediately seek sale of their assets under bankruptcy protection.

## III.   MATERIAL TERMS OF THE STALKING HORSE APA

6.        Below is a summary of the material terms of the Stalking Horse APA, all of which are more detailed therein.[1]

| Break-Up Fee | If Sellers consummate a Sale of the Acquired Assets (defined below with another successful bidder, Sellers shall pay or cause Purchaser to be paid a break-up fee of $200,000 (the "Break-Up Fee") |
| --- | --- |
| Purchase Price | Purchaser shall pay $2,400,000 (the "Cash Purchase Price") in cash for the Acquired Assets. |
| Acquired Assets | Substantially all of Sellers' Assets, including all Equipment, Assumed Contracts, Inventory, Vehicles, Accounts Receivable, Books and Records, Intellectual Property, and certain causes of actions, claims and demands (collectively, the "Acquired Assets"). |
| Excluded Assets | (a) Any avoidance actions arising under Chapter 5 of the Bankruptcy Code; (b) any claims or causes of action which Sellers may have against Robert Fougere or his affiliates or agents; (c) Sellers' website addresses; (d) cash on hand and prepaid expenses and deposits; (e) any claims of Sellers against Centrix Bank; and (f) assets listed on Schedule 1.02(d) to the Stalking Horse APA. |

---

[1]      Any capitalized terms used herein but not defined shall have the meaning given to them in the attached Stalking Horse APA, attached hereto as **Exhibit B**.

| New Property Lease | Purchaser shall negotiate in good faith to cause SPR, LLC (the "Landlord") to enter into a lease of certain real property located at 8 Harbor Road, South Burlington, VT 05403 (the "New Real Property Lease"), which New Real Property Lease shall provide for the termination of, and release of Sellers and any of Sellers' guarantors from any and all obligations under the current lease entered into on or about November 6, 2009 (the "Current Real Property Lease").[2] |
|---|---|
| Basis for Termination | (a)      by Purchaser, if the hearing on the Motion is not held by November 4, 2013;

(b)      by Purchaser, if the Court does not enter the Bidding Procedures Order within one day of the hearing on the Motion;

(c)      by Purchaser, if the hearing on approval of the Sale (the "Sale Hearing") is not held by November 19, 2013 and the Bankruptcy Court does not enter the order approving the Sale (the "Sale Order") within one day of such hearing; |

## IV.   PROPOSED BIDDING PROCEDURES

7.      Debtors' understand their duty to maximize value for their estates and, to do so, propose bidding procedures and an auction that will determine whether the Stalking Horse APA represents the highest and best offer for the Acquired Assets.  Immediately below are Debtors' proposed bidding procedures for purchase of the Acquired Assets (the "Bidding Procedures").

**Participation in the Bidding Process**. Any party other than Stalking Horse and Centrix Bank ("Bank") that is interested in purchasing the Acquired Assets (a "Potential Bidder") may obtain relevant due diligence from Debtors by:

(a)  executing a confidentiality agreement in form and substance acceptable to Debtors; and

(b)  providing Debtors with information regarding the bidder's financial ability to consummate purchase of the Acquired Assets.

**Participation in the Auction**.   To participate in the bidding process and attend the Auction, a bidder must submit what is determined by Debtors, with consent of Bank, to be

---

[2] SPR LLC is a Vermont limited liability company which Eugene Torvend, President, Director and Shareholder and Member of the Debtors in Possession,  is also a Member.

a "Qualified Bid." "Qualified Bid" means a written proposal for purchase of the Acquired Assets:

(a)   whose value is greater than the sum of (i) the Cash Purchase Price ($2,400,000), (ii) the Break-Up Fee ($200,000) and (iii) the Minimum Incremental Bid (defined below);

(b)   that is accompanied by a deposit of $100,000 (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of Debtors;

(c)   that has substantially the same terms and conditions as the Stalking Horse APA;

(d)   that is accompanied by reasonable evidence of committed financing or other ability to perform;

(e)   that is timely submitted by the Bid Deadline (defined below); and

(f)   that is irrevocable until two (2) business days after closing of the Sale and remains open until that time as a "back-up bid" at the last price and terms offered at the Auction.

The Stalking Horse APA shall be deemed to be a Qualified Bid for the Acquired Assets (the "Stalking Horse Bid").

**Bid Deadline**.  Each person wishing to bid on the Acquired Assets, except for the Stalking Horse, must deliver a bid to Debtors by 5 pm. (eastern standard time) on November 14, 2013 (the "Bid Deadline") via mail and email to:

| By Regular Mail: | By Overnight Delivery |
|---|---|
| Raymond J. Obuchowski | Raymond J. Obuchowski |
| Obuchowski & Emens-Butler, PC | Obuchowski & Emens-Butler, PC |
| PO Box 60 | 1542 Vermont Route 107 |
| Bethel, VT 05032 | Royalton, Vermont 05068 |
| ray@oeblaw.com | ray@oeblaw.com |

**Report on Bids**.  If no Qualified Bids, other than the Stalking Horse Bid, are received by the Bid Deadline, Debtors will refund any Good Faith Deposits received and report the absence of other Qualified Bids to the Bankruptcy Court and all parties in interest by filing a notice with the Bankruptcy Court.  At the Sale Hearing, Debtors will seek entry of an

order approving the Stalking Horse's purchase of the Acquired Assets pursuant to the terms set forth in the Stalking Horse APA and proposed Sale Order.

**Auction**.  If there are at least two Qualified Bids for the Acquired Assets (including the Stalking Horse Bid), Debtors will conduct an auction on November 18, 2013 at 9 a.m. at Sheehey Furlong & Behm P.C., 30 Main Street, 6th Floor, Burlington, VT 05402-0066, at which time each person that has timely submitted a Qualified Bid will be entitled to participate as a bidder.  Bidding will begin with the highest and best Qualified Bid and continue in increments of not less than $100,000 (the "Minimum Incremental Bid") and will not conclude until each participating bidder has had the opportunity to submit any additional Qualified Bid(s).  At the conclusion of bidding, Debtors will announce their determination as to the party (the "Successful Bidder") submitting the highest and best bid (the "Successful Bid") for the Acquired Assets and will request Bankruptcy Court approval of the Successful Bid at the Sale Hearing.

## V.      **PROPOSED AUCTION AND HEARING DATES**

8.      **Sale Hearing Date**.  Under the termination provisions in Article IX of the Stalking Horse APA, a basis for termination by Purchaser is failure to hold the Sale Hearing by November 22, 2013.  Thus, in the Bidding Procedures Order, Debtors seek establishment of a date no later than November 22, 2013 for the Sale Hearing.  At the Sale Hearing, Debtors will seek approval of the Sale (i) to the Stalking Horse under the terms of the Stalking Horse APA, including the assumption and assigned of Assumed Contracts (as defined therein), pursuant to the proposed Sale Order, attached hereto as **Exhibit C**, or (ii) approval of the Sale to another party that becomes the Successful Bidder at Auction, pursuant to their competing asset purchase agreement.

9.      Debtors request that November 15, 2013 be established as the deadline to file any objections to the relief to be considered at the Sale Hearing.

10.      **Auction Date**.  Debtors seek establishment of a date no later than November  18, 2013 for the Auction.

## VI.    POTENTIAL LIEN PARTIES

11.    Debtors submit that listed below are all the parties known by Debtors or shown in the public record to claim a lien on any of the Acquired Assets (the "Lien Parties"):

a.    Centrix Bank holds a secured claim of $3,607,208.70 against Debtors, secured by a blanket lien on Debtor's assets.

b.    Grenier Center LLC holds a secured claim against Debtors, secured by a blanket lien on Debtor's assets (subject to the prior lien of Centrix Bank and Business Finance Authority of the State of New Hampshire).

c.    Internal Revenue Service filed a lien of $936,071.98 against Debtor's property.

d.    Business Finance Authority of the State of New Hampshire filed a lien against Debtors' equipment for a claim of $695,000.

e.    AEC, Inc. has a purchase money security interest in certain of Debtors' products included in the Acquired Assets. (The Debtor believes that such claim has been paid and is in the process of verifying, and seeking termination of the security interest, if paid.)

f.    NS Leasing, LLC has secured leases for certain equipment included in the Acquired Assets.

## VII.   PROPOSED NOTICE PROCEDURES

12.    Pursuant to Bankruptcy Rule 2002(m), this Court is empowered to enter any order "designating the matters in respect to which, the entity to whom, and the form and manner in which notices shall be sent except as otherwise provided by these rules." Fed. R. Bankr. P. 2002(m). Sales of property outside of the ordinary course of business may be by public auction and notice of the proposed sale and time and place for auction must be provided in accordance

with Bankruptcy Rule 2002(c)(1). Fed. R. Bankr. P. 2002 (c)(1) and 6004(f)(1).   Further, pursuant to Bankruptcy Rule 2002(a)(2), this Court may shorten or otherwise modify the 21 day notice period.  Fed. R. Bankr. P. 2002(a)(2).

13.      Debtors submit that the following proposed notice forms and procedures satisfy the notice requirements of Bankruptcy Rules 2002 and 6004.

14.      **Bidding Procedures Order**.  Within one (1) business day of the entry of the Bidding Procedures Order, Debtors will provide a copy of such order to: (i) the Office of the United States Trustee for the District of Vermont, (ii) Centrix Bank, Debtors' secured lender, (iii) Stalking Horse, (iv) SPR, LLC, Debtors' South Burlington landlord, (v) all parties who have (or are identified on public record as claiming to have) a lien, claim, interest or encumbrance in the Acquired Assets, including the Lien Parties, (vi) all non-debtor parties to a Potential Assumed Contract (defined below), (vii) all other parties listed on the master mailing list, (viii) all parties that Debtors, through due diligence, determine to be potential bidders, (ix) all taxing authorities in the jurisdictions where Debtors operate that have a reasonably known interest in the relief requested, and (x) all federal, state and local regulatory authorities known by Debtors to assert jurisdiction over Debtors or their property and to have an interest in the proposed Sale, including, without limitation, all federal, state and local environmental agencies in the jurisdictions where Debtors operate or own or lease real property (collectively, the "Notice Parties").

15.      **Bidding, Auction and Sale Notice**.  Attached hereto as **Exhibit 1** to the Bidding Procedures Order is a "Notice of Proposed Sale, Bidding Procedures, Auction Date and Sale Hearing" (the "Bidding, Auction and Sale Notice").   The Bidding, Auction and Sale Notice provides notice of (i) the proposed Sale (including a description of the Acquired Assets), (ii) the

Stalking Horse APA, (iii) the Bidding Procedures, (iv) the time and location of the Auction and (iv) the time and location of the Sale Hearing.

16.     Debtors will provide a copy of the Bidding, Auction and Sale Notice to the Notice Parties within one (1) business day after entry of the Bidding Procedures Order.

17.     **Cure Notice**.  Attached hereto as **Exhibit 2** to the Bidding Procedures Order is a "Notice of Cure Amount for Counterparties to Executory Contracts and Unexpired Leases that may be Assumed and Assigned" (the "Cure Notice") that will be sent within one (1) business day after entry of the Bidding Procedures Order to all non-debtor counterparties to any contract or lease that Debtors reasonably expect a purchaser to assume and assign in connection with the Sale (a "Potential Assumed Contract"), including all Assumed Contracts (defined therein) identified in the Stalking Horse APA.  Debtors will attach to the Cure Notice their calculation of the cure amount Debtors believe must be paid to cure all defaults under such contract or lease (the "Cure Amount").  The Cure Notice designates that counterparties have until November 14, 2013 ("Cure Objection Deadline") to file an objection (a "Cure Objection") to the Cure Amount. If no amount is listed on the Cure Notice, or is shown as "0", Debtors believe that there are no defaults to be cured.

18.     Debtors submit that the foregoing notice procedures provide the most effective notice of the relief requested herein.  All of the notices and the Bidding Procedures Order provide Debtors' counsel contact information and inform parties in interest that additional pleadings, such as this Motion and the Stalking Horse APA, can be obtained upon request to Debtors' counsel.

## VIII.   PROCEDURES RELATING TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

19.      Unless a counterparty to a Potential Assumed Contract files a Cure Objection by the Cure Objection Deadline, that party shall be forever barred from objecting to the Cure Amount and from asserting any additional cure or default amounts against Debtors, Stalking Horse or such other Successful Bidder.

20.      In the event a Cure Objection is timely filed, the objection must (i) set forth (a) the basis for the objection with specificity and (b) the amount the party asserts as the correct cure amount under the Potential Assumed Contract and (ii) attach supporting documentation.   If Debtors and the objecting party cannot consensually resolve the Cure Objection, Debtors will segregate any disputed cure amounts pending resolution by this Court or mutual agreement of the parties.

21.      Hearing on any Cure Objection may be held (a) at the Sale Hearing, or (b) on such other date as the Court may designate, provided that if the Potential Assumed Contract is assumed and assigned prior to such hearing, the cure amount asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited and held by Debtors in a segregated account pending further order of this Court or mutual agreement of the parties.

22.      Debtors' decision to assume and assign a Potential Assumed Contract is subject to Court approval and consummation of the proposed Sale.  Absent consummation of the proposed Sale and Court approval, none of the Potential Assumed Contracts shall be deemed assumed or assigned, and shall be subject to further administration under the Bankruptcy Code.

23.      Except to the extent otherwise provided in the Stalking Horse APA or agreement with such other Successful Bidder, the Stalking Horse or such other Successful Bidder (or any assignees) shall not be subject to any liability or other obligation under a Potential Assumed

13

Contract that accrued or first arose before closing of the proposed Sale. Debtors shall be relieved

of all liability accruing or arising after such closing pursuant to Section 365(k) of the Bankruptcy

Code.

## IX.   THE PROPOSED SALE IS IN THE BEST INTERESTS OF DEBTORS' ESTATES, CREDITORS, AND INTEREST HOLDERS

24.     The proposed Sale is supported by sound business justifications. Debtors and

their advisors believe that creditors will receive more value through the prompt Sale of the

Acquired Assets than through continued operations or delayed sale.

### A.  Applicable Legal Standards

25.     Ample authority exists for the approval of the proposed Sale. Section 363(b)(1)

of the Bankruptcy Code authorizes a debtor to sell assets of the estate other than in the ordinary

course of business. 11 U.S.C. § 363(b)(1) *see also* Fed. R. Bankr. P. 6004(f)(1) ("All sales not in

the ordinary course of business may be by private sale or by public auction.").

26.     Courts have identified various factors and tests to determine when a debtor can

sell its assets outside the ordinary course of business, particularly substantially all of its assets.

In *Lionel*, the Second Circuit identified several relevant factors but cautioned that its list was not

exhaustive, but rather to be used as "guidance."[3] *Committee of Equity Security Holders v. Lionel

Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983); *see also In re Burke Mtn.

Recreation, Inc.*, 56 B.R. 72, 73 (D. Vt. 1985) (relying on *Lionel* analysis in approving sale out

---

[3]     The Second Circuit identified the following factors: (1) the proportional value of the asset to the estate as a whole; (2) the elapse of time since filing; (3) the likelihood that a plan of reorganization will be proposed and confirmed in the near future; (4) the effect of the proposed disposition on future plans of reorganization; (5) the proceeds to be obtained from the disposition VIS–A–VIS any appraisals on the property; (6) which of the alternatives of use sale, or lease the proposal, envisions; and (7) whether the asset is increasing or decreasing in value. *Lionel*, 722 F.2d at 1071.

of the ordinary course).   Other courts have identified the "sound business purpose" test that evaluates similar factors, namely, (a) that a "sound business purpose" justifies the sale of assets outside the ordinary course of business, (b) that adequate and reasonable notice has been provided to interested persons, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith.   *Titusville Country Club v. Pennbank (In re Titusville Country Club)*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991);

27.   These factors and tests are all a variation of one core element:   a debtor must articulate a business justification for sale of assets outside the ordinary course based on the specific facts and context of the case.   *See Coastal Indus., Inc. v. United States (In re Coastal Indus., Inc.)*, 63 B.R. 361, 367 (Bankr. N.D. Iowa 1986) (noting agreement among courts that "the bankruptcy court must be given wide latitude and accorded great discretion in determining whether the proposed sale should be approved"); *In re Baldwin United Corp.*, 43 B.R. 888, 906 (Bankr. S.D. Ohio 1984) (a sound business justification need not be unduly exhaustive but, rather, a debtor is "simply required to justify the proposed disposition with sound business reasons.").

28.   Here, Debtors, for many reasons, have a strong business justification for the Sale. First, Debtors believe that the Sale, in accordance with the Bidding Procedures and terms of the Stalking Horse APA, will enable them to obtain the greatest value for the Acquired Assets and, in particular, all cash consideration.   As several courts have noted, the paramount goal for any proposed sale or property of a bankruptcy estate is to maximize the proceeds received by the estate.   *See, e.g., Official Comm. Of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) ("'It is a well-established principle of bankruptcy law that the objective of bankruptcy rules and the [Debtor's] duty with respect to

such sales is to obtain the highest price or greatest overall benefit possible for the estate.'" (quoting *Cello Bag Co. v. Champion Int'l Corp (In re Atlanta Packaging Prods., Inc.*), 99 B.R. 124,130 (Bankr. N.D. Ga. 1988)).

29.     Debtors and their secured lender believe that the total consideration to be paid by Stalking Horse is fair and reasonable and, moreover, the Auction will establish the highest and best offer for the Acquired Assets.

30.     Second, the Sale proceeds will be used by and distributed to Debtors' estates in accordance with Debtors' proposed DIP financing, which includes  a carve-out of $50,000(the "Carve-Out") for administrative expenses.   Thus, while the proposed Sale Order reflects that Bank's lien attaches to all Sale Proceeds, Bank's proposed DIP financing and the incorporated Carve-Out provide Debtors with the liquidity to close the Sale and, thereafter, liquidate remaining assets and causes of action to bring in additional value.   In particular, the DIP financing allows Debtors to pay all prepetition and postpetition employee wages.   Because the Sale includes substantially all of Debtors' assets, it is likely that all or mostly all of Debtors' employees will be employed by Stalking Horse after the Sale closing.   Payment of employee wages through closing allows Debtors to retain employees and thus make transition of these retained employees to Stalking Horse after closing a viable opportunity.   This would not have been possible with a sale outside of bankruptcy, but here, with Bank's financing, Debtors' will be able to maximize value instead of shuttering their doors.

31.     Further, the referenced "good faith" requirement for the approval of a sale outside the ordinary course of business is met here.   *See, e.g., In re Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986); *In re Snyder*, 74 B.R. 872, 876-77 (Bankr. E.D Pa. 1987).   The issue of good faith in connection with the sale outside the ordinary course of business focuses principally on the

element of special treatment of insiders in sale transactions.  *See In re Industrial Valley Refrigeration & Air Conditioning Supp., Inc.*, 77 B. R. 15, 20-21 (Bankr. E.D. Pa. 1987).  Here, the proposed Sale is not to an insider of Debtors.  Debtors' developed an arms' length process in connection with the Stalking Horse APA.

32.     Accordingly, as set forth herein, the proposed Sale is supported by sound business reasons, in good faith, in the best interests of Debtors' estates and, as detailed above, proposed with adequate notice.

**B.  The Proposed Sale and Purchase Is in Good Faith under Section 363(m)**

33.     Section 363(m) of the Bankruptcy Code provides certain protections to a purchaser, stating that:

> The reversal or modification on appeal of an authorization under [Section 363(b) or (c)] of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

34.     Determination of "in good faith" is based upon traditional equitable principles, including whether there has been full disclosure to the bankruptcy court. *Kabro Assocs. Of W. Islip, LLC v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997). Debtors have fully disclosed and requested the Court's approval of all of the terms and conditions of the Stalking Horse APA and intend to provide notice as directed by the Court.

35.     Typically, a purchaser is found to be without good faith when "a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders."  *In re Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986).  There are no actions here that could be characterized as falling within that category

of conduct.  Stalking Horse is not an equity holder of Debtors, nor does any of its representatives

serve on Debtors' board of directors.  The Stalking Horse APA was negotiated at arms' length by

parties represented by separate experienced professionals.  Thus, Stalking Horse should therefore

be considered a good faith purchaser under Section 363(m).

**C.  The Proposed Sale Satisfies the Requirements of Section 363(f) of the Bankruptcy Code**

36.      All of the Acquired Assets have been pledged to Bank, who has consented to the

sale free and clear of all liens, claims, interests and encumbrances, provided that Bank's liens

attach to the Sale proceeds.  Various other creditors may also hold or assert security interests in

some of the Acquired Assets.  Thus, in order to facilitate the Sale, Debtors request authorization

to sell all of the Acquired Assets free and clear of any and all liens, claims, encumbrances, and

other interests which may be asserted.

37.      Under Section 363(f) of the Bankruptcy Code, Debtors' may sell the Acquired

Assets "free and clear of any interest in such property of an entity other than the estate" if *any

one* of the following conditions is satisfied:

    (1)      applicable nonbankruptcy law permits sale of such property free and clear of such
           interest;
    (2)      such entity consents;
    (3)      such interest is a lien and the price at which such property is to be sold is greater
           than the aggregate value of all liens on such property;
    (4)      such interest is in bona fide dispute; or
    (5)      such entity could be compelled, in a legal or equitable proceeding, to accept a
           money satisfaction of such interest.

11 U.S.C. § 363(f); *see Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343,

345 (E.D. Pa. 1988) (Section 363(f) "is written in the disjunctive, not the conjunctive.

Therefore, if any of the five conditions of § 363(f) are met, the Trustee has the authority to

conduct the sale free and clear of all liens"); s*ee also Mich. Emp't Sec. Comm'n v. Wolverine*

*Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132, 1147 n.24 (6th Cir. 1991) (same).

Debtors anticipate that they can satisfy one or more of these requirements.

38.     To the extent any party claiming a lien, claim, encumbrance or other interest in the Acquired Assets receives notice of the proposed Sale but does not timely object, that party is deemed to have consented to the Sale. *See, e.g., Veltman v. Whetzel,* 93 F.3d 517, 521 (8th Cir. 1996) (failure to object to proposed sale, coupled with agreement to stipulation authorizing sale free of interest, constituted consent); *accord Hargrave v. Pemberton (In re Tabone, Inc.)*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994); *In re Elliot*, 94 B.R. at 346.

39.     In addition, because the Acquired Assets will be sold for what Debtors, in their business judgment, believe to be fair value, particularly in light of the opportunity for competitive bidding at the Auction, the holders of any liens thereon can be compelled to accept money in satisfaction of the same, satisfying the requirement of Section 363(f)(5). *See In re WPRV-TV, Inc.,* 143 B.R. 315, 321 (D.P.R. 1991), *vacated on other grounds,* 165 B.R. 1 (D.P.R. 1992), *aff'd in part, rev'd in part*, 983 F.2d 336 (1st Cir. 1993).

40.     Accordingly, Debtors submit that at least one (if not more) of the subsections of Section 363(f) will be satisfied, such that the Court should approve the Sale of the Acquired Assets free and clear of all liens, claims, encumbrances, and other interests.  All liens on the Acquired Assets will attach to the Sale proceeds with the same force, effect, and priority and subject to the same defenses.

**D.  Cause Exists to Approve the Break-Up Fee**

41.     Here, the appropriate factors to be considered compel approval of the Break-Up Fee ($200,000).  Break-up fees are "important tools to encourage bidding and to maximize the value of the debtors' assets." *In re Integrated Resources,* 147 B.R. at 659.   These fees are

presumptively appropriate under the business judgment rule.  *See, e.g., Cottle v. Storer Commc'ns, Inc.*, 849 F.2d 570, 574-75 (11th Cir. 1988); *CRTF Corp. v. Federated Dep't Stores, Inc.*, 683 F. Supp. 422, 440 (S.D.N.Y. 1988); *Samjens Partners I v. Burlington Industries, Inc.*, 663 F. Supp. 614, 623 (S.D.N.Y. 1987).

42.    Here, Stalking Horse's agreement to only require the Break-Up Fee as a bidding protection, and not any other increasingly standard protections such as expense reimbursement, creates certainty with respect to Debtors' costs associated with the Stalking Horse APA.  Parties in interest can immediately evaluate the Stalking Horse APA without any unknowns such as the final calculation of expense reimbursement (and possible subsequent litigation regarding the same).

43.    Further, Stalking Horse has already provided great value by setting a baseline bid for purchase of the Acquired Assets and promoting competition without any of potentially chilling bidding requirements such as a no-shop provision.   The value of a stalking horse buyer is repeatedly recognized and no different here.  *See In re Marrose Corp.*, No. 89 B 12171, 1992 WL 33848, at *5 (Bankr. S.D.N.Y. Feb. 16, 1992); *In re Integrated Res.*, 135 B.R. at 250.  The Break-Up has undisputedly encouraged bidding because the Stalking Horse would not have entered into the Stalking Horse APA without this protection.

44.    The Break-Up Fee is also appropriate under the "business judgment rule," because it is the product of extended good faith and arm's length negotiations between Debtors and Stalking Horse.  Stalking Horse has made the highest and best offer for the Acquired Assets; however, its bid is contingent upon this Court's timely approval of Break-Up Fee and the Bidding Procedures.

45.     In sum, Debtors' ability to offer the Break-Up Fee enables them to ensure the Sale of the Acquired Assets to a contractually committed bidder (be it the Stalking Horse Bidder or any other Successful Bidder) at a price they believe to be fair while, at the same time, providing the potential of even greater benefit to the estates.   Thus, under these circumstances, the Court should not override Debtors' business judgment, and the Break-up Fee and  proposed Bidding Procedures should be approved.

## X.     REQUEST FOR WAIVER OF STAY OF BANKRUPTCY RULES 6004(h) and 6006(d)

46.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption and assignment of an executory contract or unexpired lease is stayed for a period of fourteen (14) days after entry of the order unless the court orders otherwise.   Faced with a continuing constrained cash position and significant concern regarding the loss of customers, Debtors submit that they should be authorized to close and consummate the Sale to the Successful Bidder as soon as possible after entry of the Bidding Procedures Order and the Sale Order.   In light of the ample benefits that the Sale will provide Debtors' estates and creditors, Debtors know of no reason to prolong the Auction and Sale process and request waiver of the stay imposed by Bankruptcy Rules 6004(h) and 6006(d).

### XII. NOTICE

47.     Debtors have served a copy of this Motion on the following parties, or in lieu thereof, to their counsel by overnight delivery and electronic mail (if available):  (i) the Office of the United States Trustee for the District of Vermont; (ii) Debtors' twenty (20) largest unsecured creditors; (iii) Bank; (iv) Landlord, (v) the Lien Parties, (vi) Stalking Horse (vii) all parties that

have requested notice pursuant to Bankruptcy Rule 2002, and (viii) counsel to any committee appointed in these cases.

WHEREFORE, Debtors respectfully request that the Court grant the relief requested in this Motion by entering an order substantially in the form of the proposed Bidding Procedures Order attached hereto as Exhibit A, grant the remaining relief requested in this Motion at the Sale Hearing, and grant such other and further relief as this Court deems just and proper.

Dated at Royalton, Vermont: Monday, October 21, 2013.

PLASTIC TECHNOLOGIES OF
VERMONT, INC.
PLASTIC TECHNOLOGIES OF
MARYLAND, INC.
PLASTIC TECHNOLOGIES OF
NEW YORK, LLC.

By:     /s/ *Raymond J. Obuchowski*
        Raymond J. Obuchowski, Esq.
        Donald F. Hayes, Esq.
        Obuchowski & Emens-Butler, PC
        PO Box 60
        Bethel, VT 05032
        802-234-6244
        802-234-6244  *telefax*
        ray@oeblaw.com
        www.oeblaw.com

        *Proposed Counsel to Chapter 11 Debtors*

UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF VERMONT, INC. | ) | Case No.  13-10729- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF MARYLAND, INC. | ) | Case No.  13-10730- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF NEW YORK, LLC | ) | Case No.  13-10731- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |
| | | *Pending Joint Administration* |

**ORDER (I) APPROVING BIDDING PROCEDURES FOR PROPOSED SALE
OF SUBSTANTIALLY ALL DEBTORS' ASSETS, (II) APPROVING BREAK-
UP FEE, (III) APPROVING RELATED NOTICES, (IV) SCHEDULING AN
AUCTION (V) ESTABLISHING ASSUMPTION AND ASSIGNMENT
PROCEDURES FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES,
AND (VI) SCHEDULING A SALE HEARING FOR APPROVAL OF (A) SALE
OF SUBSTANTIALLY ALL DEBTORS' ASSETS TO STALKING HORSE OR
OTHER SUCCESSFUL BIDDER FREE AND CLEAR OF ALL LIENS,
CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) ASSIGNMENT AND
ASSUMPTION OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

On October 21, 2013, Plastic Technologies of Vermont, Inc., Plastic Technologies of

Maryland, Inc., and Plastic Technologies of New York, LLC (collectively, "Debtors" or

"Sellers") filed a motion (the "Motion")[1] seeking an order: (i) approving bidding procedures for

sale of substantially all of Debtors' assets (the "Sale"), (ii) approving payment of a break-up fee

---

[1] Any capitalized terms not defined herein shall have the meaning given to them in the Motion.

EXHIBIT "A"

to Consolidated Container Company LP ("Stalking Horse" or "Purchaser"); (iii) approving the form of proposed notices; (iv) scheduling an auction (the "Auction"), (v) establishing assumption and assignment procedures for executory contracts and unexpired leases and (vi) scheduling a further hearing to consider (a) approval of the Sale to Stalking Horse pursuant to an "Asset Purchase Agreement" with Debtors (the "Stalking Horse APA") or other successful bidder based on the results of the Auction and (b) assumption and assignment of executory contracts and unexpired leases.  After hearing on October 22, 2013 and consideration of the objection filed by ____ (Doc.___), the Court has determined that granting the relief requested in the Motion is in the best interests of Debtors, their estates, creditors and other parties in interest, and is a proper exercise of Debtors' business judgment.  It appears that proper and adequate notice of the Motion has been given, no other or further notice is necessary, and good and sufficient cause for this Order has been shown.  Accordingly, it is hereby FOUND THAT:

A.      This Court has jurisdiction over the above-captioned cases, this proceeding and over Debtors' property pursuant to 28 U.S.C. §§ 157(a) and 1334.  This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (M) and (0).

B.      Notice of the Hearing, the Motion and proposed entry of this Order is sufficient for all purposes under the Bankruptcy Code, Bankruptcy Rules and Local Rules of this Court, including, without limitation, 11 U.S.C. § 102(1).

C.      Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Motion regarding the Bidding Procedures.  The Bidding Procedures were negotiated in good faith by Debtors and Stalking Horse and are reasonable and appropriate.

D.      The form of notices, parties to be served, and method of service proposed by Debtors (described in more detail below) are reasonable and appropriate, and are in compliance with applicable Bankruptcy Rules.

E.      Stalking Horse has expended, and likely will continue to expend, considerable time, money and energy pursuing its proposed purchase of the Acquired Assets and has engaged in extended arm's length and good faith negotiations.   The Stalking Horse APA is the culmination of these efforts.

F.      Debtors have demonstrated a compelling and sound business justification for authorizing payment of the Break-Up Fee to Stalking Horse.  Debtors' payment to Stalking Horse of the Break-Up Fee is:  (i) an actual and necessary cost and expense of preserving Debtors' estates; (ii) of substantial benefit to Debtors' estates by inducing the Stalking Horse Bid and thus promoting competitive bidding; (iii) reasonable and appropriate, in light of, among other things, (a) the size and nature of the proposed Sale, (b) the substantial efforts that have been and will be expended by Stalking Horse, and (c) the benefits that Stalking Horse has provided to Debtors' estates and creditors and all parties in interest herein, notwithstanding that the proposed Sale is subject to higher or better offers; and (iv) necessary to ensure that Stalking Horse will continue to pursue the proposed Sale.

G.      The procedures proposed by Debtors relating to the assumption and assignment of certain executory contracts and unexpired leases, including the form of the Cure Notice, are reasonable and appropriate, and are in compliance with applicable Bankruptcy Rules.

H.      The entry of this Order is in the best interests of Debtors, their estates, creditors and other parties-in-interest; and it is therefore

ORDERED, ADJUDGED AND DECREED THAT:

1.      The relief requested in the Motion is GRANTED. All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled are overruled or resolved as set forth herein.

2.      The Break-Up Fee is hereby approved in all respects.  Debtors shall pay the Break-Up Fee to Stalking Horse pursuant to the terms and conditions set forth in the Stalking Horse APA without further order of this Court.  The Break-Up Fee is an administrative expense of Debtors' estates and shall be paid directly from the proceeds of any Alternative Transaction free and clear of any lien, claim, interest or encumbrance, including any lien, claim, interest or encumbrance of Centrix Bank.

3.      The Bidding Procedures are approved in all respects.  The Bidding, Auction and Sale Notice attached hereto as **Exhibit 1**, is hereby approved and fully incorporated into this Order, and shall apply with respect to the Debtors' proposed Sale of the Acquired Assets. Debtors are authorized to take any and all actions necessary to implement the Bidding Procedures as set forth in the Bidding, Auction and Sale Notice.  As set forth in the Bidding Procedures, the **Bid Deadline** is **November 14, 2013 at 5 p.m. (Eastern Time)**.  If a Bid (other than the Stalking Horse Bid) is received by the Bid Deadline and determined to be a Qualified Bid, Debtors shall conduct an **Auction** which shall commence at 9 a.m. (Eastern Time), on November 18, 2013 at Sheehey Furlong & Behm P.C, 30 Main Street, 6th Floor, Burlington, VT 05402-0066.  The Court will not grant any requests for an extension of the Bid Deadline.

4.      Not later than one (1) business day from the entry of this Order, Debtors shall send, by first-class mail postage prepaid, a copy of this Order and the Bidding, Auction and Sale Notice to: (i) the Office of the United States Trustee for the District of Vermont, (ii) Centrix

4

Bank, Debtors' secured lender, (iii) Stalking Horse, (iv) SPR, LLC, Debtors' landlord, (v) all parties who have (or are identified on public record as claiming to have) a lien, claim, interest or encumbrance in the Acquired Assets, including the Lien Parties, (vi) all non-debtor parties to a Potential Assumed Contract, (vii) all other parties listed on the master mailing list, (viii) all parties that Debtors, through due diligence, determine to be potential bidders, (ix) all taxing authorities in the jurisdictions where Debtors operate that have a reasonably known interest in the relief requested, and (x) all federal, state and local regulatory authorities known by Debtors to assert jurisdiction over Debtors or their property and to have an interest in the proposed Sale, including, without limitation, all federal, state and local environmental agencies in the jurisdictions where Debtors operate or own or lease real property.

5.     The Cure Notice attached hereto as **Exhibit 2**, is hereby approved and fully incorporated into this Order, and shall apply with respect to Debtors' proposed Sale of the Acquired Assets.  Not later than one (1) business day from entry of this Order, Debtors shall send, by first-class mail postage prepaid, a Cure Notice to non-debtor counterparties to a Potential Assumed Contract, which is any contract or lease that Debtors reasonably expect a purchaser to assume and assign in connection with the Sale, including all Assumed Contracts (defined therein) identified in the Stalking Horse APA.  Debtors will attach to the Cure Notice their calculation of the Cure Amount, the amount Debtors believe must be paid to cure all defaults under the Potential Assumed Contract.  If no amount is listed on the Cure Notice or is shown as "0", Debtors believe that there are no default amounts.

6.     Unless a counterparty to a Potential Assumed Contract files a Cure Objection by November 14, 2013, the Cure Objection Deadline, that party shall be forever barred from

objecting to the Cure Amount and from asserting any additional cure or default amounts against Debtors, Stalking Horse or such other Successful Bidder of the Acquired Assets.

7.      A Cure Objection must be served on the following parties by the Cure Objection Deadline: (i) counsel to Debtors, Raymond J. Obuchowski, Obuchowski & Emens-Butler, PC, PO Box 60, Bethel, VT 05032, (ii) counsel for Bank, Daniel W. Sklar, Nixon Peabody, 900 Elm Street, Manchester, NH 03101, (iii) counsel for Stalking Horse, Jason H. Watson and Heather Byrd Asher, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, and (iv) counsel to the Official Committee of Unsecured Creditors, if one has been appointed.

8.      In the event a Cure Objection is timely filed, the objection must (i) set forth (a) the basis for the objection with specificity and (b) the amount asserted as the correct cure amount under the Potential Assumed Contract and (ii) attach supporting documentation.  If Debtors and the objecting party cannot consensually resolve the Cure Objection, Debtors will segregate any disputed cure amounts pending resolution by this Court or mutual agreement of the parties.

9.      Hearing on any Cure Objection may be held (i) at the Sale Hearing, or (ii) on such other date as the Court may designate, provided that if the Potential Assumed Contract is assumed and assigned prior to such hearing, the cure amount asserted by the objecting party (or such lower amount as may be fixed by this Court) shall be deposited and held by Debtors in a segregated account pending further order of this Court or mutual agreement of the parties.

10.     Debtors' decision to assume and assign any Potential Assumed Contract is subject to Court approval and consummation of the proposed Sale.  Absent consummation of the proposed Sale and Court approval, none of the Potential Assumed Contracts shall be deemed assumed or assigned, and shall be subject to further administration under the Bankruptcy Code.

11.     Except to the extent otherwise provided in the Stalking Horse APA or agreement with another Successful Bidder, the Stalking Horse or other Successful Bidder (or any assignees) shall not be subject to any liability or other obligation under a Potential Assumed Contract that accrued or first arose before closing of the proposed Sale.  Debtors shall be relieved of all liability accruing or arising after closing of the Sale pursuant to Section 365(k) of the Bankruptcy Code.

12.     Objections, if any, to the remaining relief requested in the Motion must: (i) be in writing; (ii) comply with the Bankruptcy Rules and the Local Bankruptcy Rules; (iii) be filed by November 15, 2013 with the clerk of the Bankruptcy Court for the District of Vermont, Clerk, U.S. Bankruptcy Court, P.O. Box 6648, Rutland, VT 05702 and (iv) be served on the same day upon:  (a) counsel to Debtors, Raymond J. Obuchowski, Obuchowski & Emens-Butler, PC, PO Box 60, Bethel, VT 05032, (b) counsel for Bank, Daniel W. Sklar, Nixon Peabody, 900 Elm Street, Manchester, NH 03101, (c) counsel for Stalking Horse, Jason H. Watson and Heather Byrd Asher, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, and (d) counsel to the Official Committee of Unsecured Creditors, if one has been appointed.

13.     The Sale Hearing shall be held before this Court on November 19, 2013 at _____ (Eastern Time).  The Sale Hearing may be adjourned, from time to time, without further notice to creditors or other parties in interest other than by announcement of the Court.

14.     This Order shall constitute findings of fact and conclusions of law and shall take effect immediately upon execution hereof.

15.     This Order shall not be stayed for fourteen (14) days after the entry thereof as provided by Bankruptcy Rules 6004(h) and 6006(d), and shall be effective and enforceable immediately upon its entry on this Court's docket.

16.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

17.     Debtors or their agent are directed to serve a copy of this Order on the applicable notice parties.

18.     This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

**SO ORDERED**

**Dated: _____**

_____
**The Honorable Colleen A. Brown**
**United States Bankruptcy Judge**

UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

IN RE:                                                    )
                                                          )
PLASTIC TECHNOLOGIES OF VERMONT, INC.                     )        Case No.  13-10729- cab
                                                          )        *Chapter 11 case*
                               Debtor in Possession.      )
_____

IN RE:                                                    )
                                                          )
PLASTIC TECHNOLOGIES OF MARYLAND, INC.                    )        Case No.  13-10730- cab
                                                          )        *Chapter 11 case*
                               Debtor in Possession.      )
_____

IN RE:                                                    )
                                                          )
PLASTIC TECHNOLOGIES OF NEW YORK, LLC                     )        Case No.  13-10731- cab
                                                          )        *Chapter 11 case*
                               Debtor in Possession.      )
                                                                   *Pending Joint Administration*

---

**NOTICE OF PROPOSED SALE, BIDDING PROCEDURES,
AUCTION DATE AND SALE HEARING**

---

PLEASE TAKE NOTICE that, on October 21, 2013, Plastic Technologies of Vermont, Inc., Plastic Technologies of Maryland, Inc., and Plastic Technologies of New York, LLC (collectively, "Debtors" or "Sellers") filed a motion seeking to sell substantially all of their assets (the "Acquired Assets") to Consolidated Container Company LP (the "Stalking Horse" or "Purchaser") pursuant to an "Asset Purchase Agreement" between Debtors and Stalking Horse (the "Stalking Horse APA") or another purchaser presenting a higher and better offer at auction.

The Acquired Assets are detailed in the Stalking Horse APA and generally include (as defined therein):

- 1 -

EXHIBIT "1"

All Equipment, including all furniture, machinery, equipment, tools, computers, terminals, computer equipment, office equipment, business machines, telephones and telephone systems, parts, and accessories.

All Assumed Contracts, including certain executory contracts, leases, warranties, commitments, agreements, credit guaranties, and purchase and sale orders.

 All Inventory, including raw materials, finished goods, scrap, parts and supplies.

All Vehicles, including motor vehicles, trucks, forklifts and other rolling stock.

All Accounts Receivable, including, trade and miscellaneous accounts receivable.

All Books and Records, including data, data bases, books, records, correspondence, business plans and projections, records of sales, customer and vendor lists, files, papers

All Intellectual Property, including patents and pending patent applications, trade secrets, trade names, copyrights and computer software.

All causes of action excluding causes of action not related to the Acquired Assets or actions under Chapter 5 of the Bankruptcy Code.

PLEASE TAKE FURTHER NOTICE that on November 18, 2013 Debtors will hold an auction at 9 a.m. at Sheehey Furlong & Behm P.C, 30 Main Street, 6th Floor, Burlington, VT 05402-0066 (the "Auction").  Only parties that have submitted a Qualified Bid (defined below) may participate in the Auction.  Attached hereto are the bidding procedures for the Auction and requirements for a Qualified Bid.

PLEASE TAKE FURTHER NOTICE that if Stalking Horse is the successful bidder at the Auction, the Court will hold a hearing to consider approval of the Sale to Stalking Horse on November 19, 2013 at _____ (Eastern Time) at Federal Building, 11 Elmwood Ave, 2nd Floor, Burlington, VT (the "Sale Hearing").  If Stalking Horse is not the successful bidder, at the Sale Hearing the Court will consider approval of the Sale to the other successful bidder.  If you do not want the Court to approve the Sale to Stalking Horse or another successful bidder or if you want the Court to consider your views, then you or your attorney must file a written response

with the Clerk at the address stated below.  **Mail or file your response so that it is <u>received</u> by the Clerk by November 15, 2013 at:  Clerk, U.S. Bankruptcy Court, P.O. Box 6648, Rutland, VT 05702.  Any response to the Motion must also be served on the undersigned by November 15, 2013.**

PLEASE TAKE FURTHER NOTICE that if you would like to receive a copy of the Motion, the Stalking Horse APA, or any other filings, you may do so by making a request to Debtors' counsel, Raymond J. Obuchowski (i) by mail to Obuchowski & Emens-Butler, PC, PO Box 60, Bethel, VT 05032, (ii) by telephone at 802-234-6244 or (iii) via email at ray@oeblaw.com.

Dated at Royalton, Vermont: Monday, October 21, 2013.

PLASTIC TECHNOLOGIES OF VERMONT, INC.
PLASTIC TECHNOLOGIES OF MARYLAND, INC.
PLASTIC TECHNOLOGIES OF NEW YORK, LLC.

By:   /s/ *Raymond J. Obuchowski*
Raymond J. Obuchowski, Esq.
Donald F. Hayes, Esq.
Obuchowski & Emens-Butler, PC
PO Box 60
Bethel, VT 05032
802-234-6244
802-234-6244  *telefax*
ray@oeblaw.com
www.oeblaw.com

*Proposed Counsel to Chapter 11 Debtors*

## BIDDING PROCEDURES

**Participation in the Bidding Process**. Any party other than Consolidated Container Company LP ("Stalking Horse") and Centrix Bank ("Bank") that is interested in purchasing the Acquired Assets (a "Potential Bidder") may obtain relevant due diligence from Debtors by:

> (a)     executing a confidentiality agreement in form and substance acceptable to Debtors; and

> (b)     providing Debtors with information regarding the bidder's financial ability to consummate purchase of the Acquired Assets.

**Participation in the Auction**.  To participate in the bidding process and attend an auction for purchase of the Acquired Assets, a bidder must submit what is determined by Debtors, with consent of Bank, to be a "Qualified Bid." "Qualified Bid" means a written proposal for purchase of the Acquired Assets:

> (a) whose value is greater than the sum of (i) the Cash Purchase Price ($2,400,000), (ii) the Break-Up Fee ($250,000) and (iii) the Minimum Incremental Bid (defined below);

> (b) that is accompanied by a deposit of $100,000 (the "Good Faith Deposit") in the form of a certified check or cash payable to the order of Debtors;

> (c) that has substantially the same terms and conditions as the Stalking Horse APA;

> (d) that is accompanied by reasonable evidence of committed financing or other ability to perform;

> (e) that is timely submitted by the Bid Deadline (defined below);  and

> (f) that is irrevocable until two (2) business days after closing of the Sale and remains open until that time as a "back-up bid" at the last price and terms offered at the Auction.

The "Asset Purchase Agreement" between Debtors and Stalking Horse (the "Stalking Horse APA") shall be deemed to be a Qualified Bid for the Acquired Assets (the "Stalking Horse Bid").

**Bid Deadline**.  Each person wishing to bid on the Acquired Assets, except for Stalking Horse, must deliver a bid to Debtors by 5 p.m. (Eastern Time) on November 15, 2013 (the "Bid Deadline") via mail and email to:

| By Regular Mail: | By Overnight Delivery |
|---|---|
| Raymond J. Obuchowski | Raymond J. Obuchowski |
| Obuchowski & Emens-Butler, PC | Obuchowski & Emens-Butler, PC |
| PO Box 60 | 1542 Vermont Route 107 |
| Bethel, VT 05032 | Royalton, Vermont 05068 |
| ray@oeblaw.com | ray@oeblaw.com |

**Report on Bids**.  If no Qualified Bids, other than the Stalking Horse Bid, are received by the Bid Deadline, Debtors will refund any Good Faith Deposits received and report the absence of other Qualified Bids to the Bankruptcy Court and all parties-in-interest by filing a notice with the Bankruptcy Court.  At the Sale Hearing, Debtors will seek entry of an order approving Stalking Horse's purchase of the Acquired Assets pursuant to the terms set forth in the Stalking Horse APA and proposed Sale Order.

**Auction**.  If there are at least two Qualified Bids for the Acquired Assets (including the Stalking Horse Bid), Debtors will conduct an auction on November 18, 2013 at 9 a.m. at Sheehey Furlong & Behm P.C, 30 Main Street, 6th Floor, Burlington, VT 05402-0066, at which time each person that has timely submitted a Qualified Bid will be entitled to participate as a bidder.  Bidding will begin with the highest and best Qualified Bid and continue in increments of not less than $100,000 (the "Minimum Incremental Bid") and will not conclude until each participating bidder has had the opportunity to submit any additional Qualified Bid(s).  At the conclusion of bidding, Debtors will announce their determination as to the party submitting the highest and best bid (the "Successful Bid") for the Acquired Assets and will request Bankruptcy Court approval of the Successful Bid at the Sale Hearing.

UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF VERMONT, INC. | ) | Case No.  13-10729- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF MARYLAND, INC. | ) | Case No.  13-10730- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF NEW YORK, LLC | ) | Case No.  13-10731- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |
| | ) | *Pending Joint Administration* |

---

**NOTICE OF CURE AMOUNT FOR COUNTERPARTIES
TO EXECUTORY CONTRACTS AND UNEXPIRED LEASES
THAT MAY BE ASSUMED AND ASSIGNED**

---

PLEASE TAKE NOTICE that, on October 21, 2013 Plastic Technologies of Vermont, Inc., Plastic Technologies of Maryland, Inc., and Plastic Technologies of New York, LLC (collectively, "Debtors" or "Sellers") filed a motion seeking to sell substantially all of their assets (the "Acquired Assets") to Consolidated Container Company LP ("Stalking Horse" or "Purchaser") pursuant to an "Asset Purchase Agreement" between Debtors and Stalking Horse (the "Stalking Horse APA") subject to the highest and best bid obtained at auction from Stalking Horse or another purchaser.

**The Acquired Assets that Debtors seek to sell include various executory contracts and unexpired leases (the "Potential Assumed Contracts") that Debtors will seek to assume and**

1

EXHIBIT "2"

assign to Stalking Horse or other successful bidder at the auction to be held on November 18, 2013.

PLEASE TAKE FURTHER NOTICE that the Court entered an order (the "Bidding Procedures Order") authorizing, among other things, procedures for the assumption and assignment of Potential Assumed Contracts and notice of cure amounts.

PLEASE TAKE FURTHER NOTICE that the Court will hold a hearing (the "**Sale Hearing**") on November 19, 2013 at which time Debtors will, among other things, request that the Court enter an order (the "**Sale Order**") approving sale of the Acquired Assets to Stalking Horse or other successful bidder, including the assumption and assignment of certain or all of the Potential Assumed Contracts.

PLEASE TAKE FURTHER NOTICE that Debtors' books and records show that you are a counterparty to the Potential Assumed Contract shown on **Exhibit A** attached to this Notice. Exhibit A also shows the amount Debtors' assert is necessary to cure any default under the Potential Assumed Contract as of the date of this Notice (the "Cure Amount").

**PLEASE TAKE FURTHER NOTICE that if you disagree with the Cure Amount shown for the Potential Assumed Contract on Exhibit A, you must file a written objection with the United States Bankruptcy Court for the District of Vermont, so that it is actually received by the Clerk by November 14, 2013.  The mailing address for the Clerk is: Clerk, U.S. Bankruptcy Court, P.O. Box 6648, Rutland, VT 05702.  In addition, any objection must (i) set forth (a) the basis for the objection with specificity and (b) the amount asserted as the appropriate cure amount and (ii) attach supporting documentation.**

PLEASE TAKE FURTHER NOTICE that any objection filed in connection with the Cure Notice must also be served by November 14, 2013 on the parties below: (i) counsel to Debtors, Raymond J. Obuchowski, Obuchowski & Emens-Butler, PC, PO Box 60, Bethel, VT 05032, (ii)

2

counsel for Debtors' secured lender, Daniel W. Sklar, Nixon Peabody, 900 Elm Street, Manchester, NH 03101, (iii) counsel for Stalking Horse, Jason H. Watson and Heather Byrd Asher, Alston & Bird LLP, One Atlantic Center, 1201 West Peachtree Street, Atlanta, GA 30309-3424, and (iv) counsel to the Official Committee of Unsecured Creditors, if one has been appointed. Filed objections must have a certificate attached stating when, how and on whom (including addresses) the objection was served.

**PLEASE TAKE FURTHER NOTICE that, if you (or any other non-Debtor party to a Potential Assumed Contract) do not timely file an objection to the Cure Amount for the Potential Assumed Contract, you will be deemed to have consented to the Cure Amount.**

PLEASE TAKE FURTHER NOTICE that if you would like to receive a copy of the Motion, the Stalking Horse APA, or any other filings, you may do so by making a request to Debtors' counsel, Raymond J. Obuchowski (i) by mail to Obuchowski & Emens-Butler, PC, PO Box 60, Bethel, VT 05032, (ii) by telephone at 802-234-6244 or (iii) via email at ray@oeblaw.com.

Dated at Royalton, Vermont: Monday, October 21, 2013.

PLASTIC TECHNOLOGIES OF VERMONT, INC.
PLASTIC TECHNOLOGIES OF MARYLAND, INC.
PLASTIC TECHNOLOGIES OF
NEW YORK, LLC.

By:   /s/ *Raymond J. Obuchowski*
      Raymond J. Obuchowski, Esq.
      Donald F. Hayes, Esq.
      Obuchowski & Emens-Butler, PC
      PO Box 60
      Bethel, VT 05032
      802-234-6244
      802-234-6244  *telefax*
      ray@oeblaw.com
      www.oeblaw.com

      *Proposed Counsel to Chapter 11 Debtors*

EXHIBIT A - CURE AMOUNT

Real Property Lease between Plastic Technologies of Vermont, Inc. d/b/a Shelburne Plastics and Mark Hill Investments, Inc.

Supply Contract between Plastic Technologies of Vermont, Inc. and Verger Paul Jodoin, Inc.

Supply Contract between Shelburne Plastics and Berlin Packaging

Supply Contract between Plastic Technologies of New York, LLC, d/b/a Shelburne Plastics and Farmland Dairies

Supply Contract between Plastic Technologies of Vermont, Inc. and Stonyfield Farm, Inc.[1]

Operating Lease between Shelburne Plastics and Pitney Bowes for VT Postage Meter

Operating Lease between Shelburne Plastics and Toyota Financial Commercial Services for NH Forklift

Capital Lease between Plastic Technologies of Vermont, Inc. and North Star Leasing for VT AC Drive

Capital Lease between Plastic Technologies of Vermont, Inc. and North Star Leasing for VT Lighting Project

Capital Lease between Plastic Technologies of Vermont, Inc. and North Star Leasing for VT Labeling Equipment

Capital Lease between Plastic Technologies of Vermont, Inc. d/b/a Shelburne Plastics and Air Molded Plastics for VT RS-25 Blowmold Machine

**The Debtor believes that it is current on contracts to be assigned, cure amount $0.00**

**ASSET PURCHASE AGREEMENT**

**Dated as of October 20, 2013**

**among**

**PLASTIC TECHNOLOGIES OF MARYLAND, INC.,**

**PLASTIC TECHNOLOGIES OF VERMONT, INC.,**

**PLASTIC TECHNOLOGIES OF NEW YORK, LLC**

**and**

**CONSOLIDATED CONTAINER COMPANY LP**

EXHIBIT "B"

# TABLE OF CONTENTS

**Page**

ARTICLE I SALE AND PURCHASE OF A SSETS.................................................. 1
    1.01    Sale and Purchase of Acquired Assets .................................................. 1
    1.02    Excluded Assets.................................................................................... 2
    1.03    Excluded Liabilities ............................................................................. 3
    1.04    Employee Benefit Plans ....................................................................... 3

ARTICLE II PURCHASE PRICE & CLOSING ............................................... 3
    2.01    Purchase Price ...................................................................................... 3
    2.02    Payment of Purchase Price................................................................... 3
    2.03    Break-Up Fee ....................................................................................... 3
    2.04    The Closing .......................................................................................... 4

ARTICLE III BANKRUPTCY RELATED PROVISIONS ............................... 4
    3.01    Bankruptcy Court Approval.................................................................. 4
    3.02    Bankruptcy Filings............................................................................... 6
    3.03    Notice of Qualified Bids ...................................................................... 6
    3.04    Assumed Contracts .............................................................................. 6
    3.05    Service of Bidding Procedures and Sale Motion ................................. 6

ARTICLE IV REPRESENTATIONS AND WARRANTIES OF SELLERS ............................... 6
    4.01    Validity................................................................................................. 6
    4.02    Organization......................................................................................... 7
    4.03    No Conflict........................................................................................... 7
    4.04    Title to Acquired Assets; Encumbrances ............................................ 7
    4.05    Litigation and Claims........................................................................... 7
    4.06    Brokers and Finders ............................................................................. 7

ARTICLE V REPRESENTATIONS AND WARRANTIES OF PURCHASER ......................... 7
    5.01    Organization......................................................................................... 7
    5.02    Authority and Binding Effect............................................................... 8
    5.03    No Conflict........................................................................................... 8
    5.04    Brokers and Finders ............................................................................. 8

ARTICLE VI COVENANTS AND ADDITIONAL AGREEMENTS OF SELLERS AND
    PURCHASER .................................................................................................. 8
    6.01    Consents and Approvals ....................................................................... 8
    6.02    Expenses .............................................................................................. 8
    6.03    Further Assurances............................................................................... 8
    6.04    Tax Prorations ...................................................................................... 8
    6.05    Access to Acquired Assets and Employees ......................................... 9
    6.06    Condition of Acquired Assets .............................................................. 9

6.07     Sellers' Deliveries .......................................................................................... 9
6.08     Real Property Lease .......................................................................................... 10
6.09     Conduct of Business Prior to Closing ............................................................. 10
6.10     Notification of Changes .................................................................................... 10
6.11     Phase I Report .................................................................................................. 11

ARTICLE VII DELIVERY OF DOCUMENTS ................................................................ 11
7.01     Delivery of Documents .................................................................................... 11

ARTICLE VIII CONDITIONS PRECEDENT ................................................................... 11
8.01     Conditions Precedent to Purchaser's Obligations .......................................... 11
8.02     Conditions Precedent to Sellers' Obligations ................................................. 12

ARTICLE IX TERMINATION ........................................................................................... 13
9.01     Method of Termination .................................................................................... 13
9.02     Notice of Termination ...................................................................................... 14
9.03     Effect of Termination ...................................................................................... 14

ARTICLE X MISCELLANEOUS ....................................................................................... 14
10.01    Public Announcements ..................................................................................... 14
10.02    Notices ............................................................................................................. 14
10.03    Entire Agreement ............................................................................................. 15
10.04    Modifications, Amendments and Waivers ........................................................ 16
10.05    Successors and Assigns .................................................................................... 16
10.06    Severability ....................................................................................................... 16
10.07    Choice of Law ................................................................................................... 16
10.08    No Third Party Beneficiaries ............................................................................ 16
10.09    Counterparts ..................................................................................................... 16

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement ("Agreement"), dated as of October 20, 2013, is made and entered into by and between **Consolidated Container Company LP**, a Delaware limited partnership ("Purchaser"), on the one hand, and **Plastic Technologies of Maryland, Inc., Plastic Technologies of New York, LLC** and **Plastic Technologies of Vermont, Inc.** (collectively, "Sellers").

WHEREAS, Sellers have concluded that, on or before October 21, 2013, each of Sellers intends to file petitions (the "Petitions") initiating cases (the "Bankruptcy Cases") in the United States Bankruptcy Court for the District of Vermont (the "Bankruptcy Court") pursuant to Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"); and

WHEREAS, Purchaser desires to effect the purchase and sale transaction hereunder subject to the terms and conditions set forth in this Agreement, the Sale Order (as hereinafter defined) and the Bidding Procedures Order (as hereinafter defined) and in accordance with Sections 105, 363 and 365 and other applicable provisions of the Bankruptcy Code.

NOW, THEREFORE, in consideration of the foregoing, the mutual agreements, covenants, representations and warranties contained herein, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and subject to the terms and conditions hereinafter set forth, the parties hereto agree as follows:

## ARTICLE I
## SALE AND PURCHASE OF ASSETS

**1.01    Sale and Purchase of Acquired Assets**.    On the terms and subject to the conditions hereinafter set forth, Sellers hereby agree to sell, convey, assign, transfer and deliver to Purchaser, free and clear of any and all liens, claims, charges, encumbrances and security interests of any kind or nature, and Purchaser agrees to purchase and accept from Sellers, all Sellers' assets, including, without limitation, the following assets (collectively, "Acquired Assets"):

(a)    All furniture, machinery, equipment, tools, computers, terminals, computer equipment, office equipment, business machines, telephones and telephone systems, parts, accessories, and the like, wherever located, owned by Sellers and any and all assignable warranties of third parties with respect thereto (the "Equipment"), including, but not limited to the Equipment listed on **Schedule 1.01(a)** hereto;

(b)    To the extent permitted by Section 365 of the Bankruptcy Code and other applicable law, those executory contracts, leases, warranties, commitments, agreements, credit guaranties, and purchase and sale orders identified on **Schedule 1.01(b)** hereto (collectively, "Assumed Contracts"), together with the right to receive income in respect of such Assumed Contracts on and after the Closing Date (as hereinafter defined);

(c)    All inventory, including, but not limited to, raw materials, finished goods, scrap, parts and supplies, wherever located, which is owned by Sellers as of the Closing Date (the

"Inventory"), together with all rights of Sellers against suppliers of Inventory including, without limitation, Sellers' right to receive refunds or rebates in connection with their purchase of such Inventory;

(d)     All motor vehicles, trucks, forklifts and other rolling stock (collectively, "Vehicles") owned by Sellers and all assignable warranties of third parties related thereto;

(e)     All accounts receivable, including, without limitation, trade and miscellaneous accounts receivable, recorded on the Books and Records (as defined in Section 1.01(f)) of Sellers as an asset on the Closing Date (collectively, "Accounts Receivable");

(f)     All existing data, data bases, books, records, correspondence, business plans and projections, records of sales, customer and vendor lists, files, papers and any summaries of such documents regularly prepared by Sellers, and all manuals and printed instructions of Sellers relating exclusively to the Acquired Assets (the "Books and Records");

(g)     All (1) patents and pending patent applications together with any and all continuations, divisions, reissues, extensions and renewals thereof, (2) trade secrets, know-how, inventions, formulae and processes, whether trade secrets or not, (3) a perpetual, nonexclusive, worldwide, royalty-free, fully paid up right and license to use the trade name "Shelburne Plastics" (the "Trade Name") for the purpose of (A) manufacturing rigid plastic products with already existing molds bearing the Trade Name, and (B) marketing, distributing and selling such manufactured products bearing the Trade Name, as well as all Inventory bearing the Trade Name existing at the time of this Agreement, (4) copyrights and any registrations and applications therefor, (5) assignable technology rights and licenses, and (6) assignable computer software and all other intellectual property owned by or registered in the name of Sellers, including, but not limited to, the intellectual property listed on **Schedule 1.01(g)** (the "Intellectual Property");

(h)     To the extent permitted under applicable law or regulation, all licenses, franchises, permits, certificates, consents, and other governmental or quasi-governmental authorizations of Sellers to conduct their business and to own, use or operate the Acquired Assets (other than qualifications of Sellers to do business as a foreign corporation); and

(i)     All causes of action (except for (1) those causes of action which are not related to the Acquired Assets, (2) any avoidance actions arising under Chapter 5 of the Bankruptcy Code and (3) any claims or causes of action which Sellers may have against Robert Fougere or his affiliates or agents), claims, and demands of Sellers arising out of the conduct of their business or the ownership of the Acquired Assets, including, without limitation, rights to returned or repossessed goods and rights as an unpaid vendor.

**1.02    Excluded Assets**.  Sellers shall not sell hereunder, Purchaser shall not purchase or acquire any right, title, or interest of Sellers in or to, and the Acquired Assets shall not include:

(a)     Any avoidance actions arising under Chapter 5 of the Bankruptcy Code;

(b)     Cash on hand, prepaid expenses and cash deposits;

- 2 -

(c) Any claims of Sellers against Centrix Bank or against Robert Fougere or his affiliates or agents;

(d) Any website addresses; and

(e) The assets listed on **Schedule 1.02(d)**.

The assets described in this Section 1.02 are herein collectively referred to as the "Excluded Assets."

**1.03** **Excluded Liabilities**.   Purchaser shall not assume or become liable for any obligations, commitments or liabilities of Sellers, whether known or unknown, absolute, contingent or otherwise, and whether or not related to the Acquired Assets, other than those listed in Schedule 1.01(b) (the obligations and liabilities of Sellers not assumed by Purchaser are hereinafter referred to as the "Excluded Liabilities").

**1.04** **Employee Benefit Plans**.  For the avoidance of doubt, Purchaser shall not assume nor be responsible for any employee benefit plan or related obligation of Sellers.

### ARTICLE II
### PURCHASE PRICE & CLOSING

**2.01** **Purchase Price**.   The Purchase Price for the Acquired Assets shall be Two Million Four Hundred Thousand Dollars ($2,400,000) (the "Cash Purchase Price").

**2.02** **Payment of Purchase Price**.  On the Closing Date, Purchaser shall wire transfer the Cash Purchase Price, in immediately available funds, to an account to be designated by Sellers.

**2.03** **Break-Up Fee**.

(a) Sellers agree and acknowledge that Purchaser's negotiation and execution of this Agreement has required a substantial investment of management time and a significant commitment of financial and other resources by Purchaser, and that the negotiation and execution of this Agreement has provided value to Sellers. Therefore, if any Alternative Transaction (as defined herein) closes, Sellers shall pay or cause Purchaser to be paid cash in an amount equal to $200,000 as a break-up fee (the "Break-Up Fee").

(b) Sellers' obligation to pay the Break-Up Fee under this section shall be subject to the entry of the Bidding Procedures Order (as defined herein). The Break-Up Fee shall become due and payable upon the closing of an Alternative Transaction, and shall be paid within one business day of such closing in immediately available funds to an account designated in writing by Purchaser to Sellers within a reasonable time prior to the date set forth herein and without need for order of the Bankruptcy Court (other than the Bidding Procedures Order).

(c)     As used in this Agreement, "Alternative Transaction" means any transaction that results in the sale or transfer by Sellers of the Acquired Assets to any party other than Purchaser or its assignee.

**2.04**   **The Closing**.  The closing of the purchase and sale of the Acquired Assets and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place as soon as reasonably practicable after the satisfaction or waiver of the conditions set forth in Article VIII hereof, at a location mutually agreeable to the parties hereto.  The date on which the Closing actually occurs is herein referred to as the "Closing Date." At the Closing, all of the transactions contemplated by this Agreement shall be deemed to occur simultaneously and become effective as of 12:01 a.m. Atlanta local time on the Closing Date (the "Effective Time").

**ARTICLE III**
**BANKRUPTCY RELATED PROVISIONS**

**3.01**   **Bankruptcy Court Approval**.

(a)     Promptly after execution of this Agreement and in no event later than October 21, 2013, Sellers shall file the Petitions before the Bankruptcy Court and seek joint administration of the Bankruptcy Cases.

(b)     Sellers and Purchaser acknowledge that under the Bankruptcy Code, this Agreement and the sale of the Acquired Assets are subject to Bankruptcy Court approval.  Sellers and Purchaser acknowledge that to obtain such approval, Sellers must demonstrate that they have taken reasonable steps to obtain the highest and best price possible for the Acquired Assets, including, but not limited to, giving notice of the transactions contemplated by this Agreement to creditors and other interested parties as ordered by the Bankruptcy Court, providing information about the Acquired Assets to responsible bidders, entertaining higher and better offers from responsible bidders and, if other Qualified Bids (defined herein) are obtained, conducting an auction.

(c)     As soon as possible after the execution of this Agreement, but in no event later than one business day after the filing of the Petitions, Seller shall file with the Bankruptcy Court a motion (the "Bidding Procedures and Sale Motion"), together with appropriate supporting papers and notices, seeking the entry of an order (the "Bidding Procedures Order") containing bidding and overbid procedures, protections and findings, all in form and substance reasonably satisfactory to Purchaser, and that (among other things):

(i)      approves the Break-Up Fee;

(ii)     provides that Purchaser's claim to the Break-Up Fee shall be entitled to administrative claim treatment in the Bankruptcy Cases;

(iii)    establishes a date by which Qualified Bids (defined below) must be submitted;

(iv)     establishes the procedures for an auction at which only bidders who have previously submitted a Qualified Bid may bid;

(v)      sets the minimum incremental bid amount;

(vi)     schedules the auction and a hearing to approve sale of the Acquired Assets (the "Sale Hearing");

(vii)    requires Sellers to promptly provide a copy of any Qualified Bid to Purchaser; and

(viii)   establishes procedures for the assumption and assignment of Assumed Contracts and the determination of any default amounts owed by Sellers.

"Qualified Bid" means a written competing proposal for purchase of the Acquired Assets: (a) whose value is greater than the sum of (i) the Cash Purchase Price, (ii) the Break-Up Fee and (iii) the minimum incremental bid amount for an initial incremental bid; (b) that is accompanied by a deposit of $100,000 in the form of a certified check or cash payable to Sellers; (c) that has substantially the same terms and conditions as this Agreement; (d) that is accompanied by reasonable evidence of committed financing or other ability to perform;  (e) that is timely submitted by the deadline for bids set forth in the Bidding Procedures Order and (f) that is irrevocable until two (2) business days after closing of the sale and remains open until that time as a "back-up bid" at the last price and terms offered by that bidder at auction.  For avoidance of doubt, this Agreement shall be deemed to be a Qualified Bid for the Acquired Assets.

(d)     The Bidding Procedures and Sale Motion shall also seek approval of an order approving the sale of the Acquired Assets to Purchaser, in form reasonably acceptable to Purchaser and in accordance with this Agreement, in the event that Purchaser is the successful bidder, including (i) the conveyance of the Acquired Assets to Purchaser free and clear of all claims, interests and encumbrances, (ii) waiver of any stay of the order and (iii) containing a finding that Purchaser has acted in "good faith" within the meaning of Section 363(m) of the Bankruptcy Code (the "Sale Order").

(e)     In the event an appeal is taken, or a stay pending appeal is requested, from either the Bidding Procedures Order or Sale Order, Sellers shall immediately notify Purchaser of such appeal or stay request and shall provide to Purchaser promptly a copy of the related notice of appeal or order of stay.  Sellers shall also provide Purchaser with written notice of any motion or application filed in connection with any appeal from either of such orders.  Sellers shall file papers in opposition to any appeal or request for stay pending appeal of the Bidding Procedures Order or Sale Order.

(f)     From and after the date hereof, and to the extent Purchaser is the successful bidder, Sellers shall not take any action which is intended, or fail to take any action the intent of which failure to act would result in the reversal, voiding, modification or staying of the Bidding Procedures Order or Sale Order.

**3.02**   **Bankruptcy Filings**.  From and after the date of this Agreement until the Closing Date, Sellers shall deliver to Purchaser copies of all pleadings, motions, notices, statements, schedules, applications, reports and other papers that are filed in the Bankruptcy Cases within a reasonable time after filing, but with respect to any such papers that Sellers may file that relate, in whole or in part, to this Agreement or Purchaser, its constituent members or its or their agents or representatives, Sellers shall use reasonable efforts to provide prior notice to Purchaser before filing.

**3.03**   **Notice of Qualified Bids**.  From and after the date of this Agreement, Sellers shall keep Purchaser informed on the status of all Qualified Bids received and provide Purchaser with copies of all Qualified Bids.

**3.04**   **Assumed Contracts**.

(a)      Attached hereto as Schedule 1.01(b) is a schedule of Assumed Contracts to be assigned to Purchaser on the Closing Date under Section 365 of the Bankruptcy Code.  With the consent of Sellers, Purchaser may add additional Contracts to this schedule.  No later than the date of the Sale Order, Purchaser may, as permitted by the Bankruptcy Court and with the consent of Sellers, designate additional Contracts as Assumed Contracts.  Purchaser shall have the right in its sole discretion to eliminate Contracts it previously designated as Assumed Contracts up until the date of the Sale Hearing.  With respect to the Assumed Contracts, Sellers shall cure any past defaults in order for Sellers to assume and assign to Purchaser the Assumed Contracts in accordance with Section 365 of the Bankruptcy Code.  Purchaser shall assume all rights and obligations of Sellers arising on or after the Closing Date under the Assumed Contracts.  Any Assumed Contract designated by Purchaser shall be assigned to and assumed by Purchaser at Closing to the extent permitted by law.  The final determination of which Contracts Sellers will assume and assign to Purchaser shall be within the sole discretion of Purchaser.

**3.05**   **Service of Bidding Procedures and Sale Motion**.  The Bidding Procedures and Sale Motion shall be served on all parties in interest, including but by no means limited to, all counterparties to the Assumed Contracts, state and local taxing authorities in the states and counties where Sellers operate, are incorporated or maintain property and any other entities identified in writing by Purchaser to Sellers within one (1) business day after filing of the Petitions, in a form and by means reasonably acceptable to Purchaser, at Seller's sole expense.  Sellers shall provide Purchaser with a list of the persons receiving notice at least one (1) business day prior to the filing of the Bidding Procedures and Sale Motion.

<u>**ARTICLE IV**</u>
<u>**REPRESENTATIONS AND WARRANTIES OF SELLERS**</u>

Sellers hereby represent and warrant to Purchaser as follows as of the date hereof and as of the Closing:

**4.01**   **Validity**.  Subject to approval by the Bankruptcy Court as set forth in Section 3.01, this Agreement has been duly executed and delivered by duly authorized officers of Sellers and constitutes the legal, valid and binding obligation of Sellers, enforceable against Sellers in

- 6 -

accordance with its terms except as enforceability may be limited by applicable equitable principles (whether applied at a proceeding in law or in equity) or by bankruptcy, insolvency, reorganization, moratorium or similar laws affecting creditors' rights generally, to the exercise of judicial discretion in accordance with general equitable principles and to equitable defenses that may be applied to the remedy of specific performance.  Sellers have the corporate power and authority necessary to enter into and perform their obligations under this Agreement and to consummate the transactions contemplated hereby.

**4.02   Organization**.  Plastic Technologies of Maryland, Inc. is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware.  Plastic Technologies of Vermont, Inc.  is a corporation duly organized, validly existing and in good standing under the laws of the State of Vermont.   Plastic Technologies of New York, LLC, is a limited liability company duly organized, validly existing and in good standing under the laws of the State of New York.

**4.03   No Conflict**.  Except as set forth on **Schedule 4.03** hereto, neither the execution, delivery and performance of this Agreement by Sellers nor the consummation by Sellers of the transactions contemplated hereby (a) will violate any provision of Sellers' Articles of Incorporation or Bylaws, (b) will result in a violation by Sellers of any law or order of any court or governmental unit to which Sellers are subject, or by which their assets are bound, (c) requires the consent of any third party, (d) or will result in the creation or imposition of any lien, charge, encumbrance or security interest of any kind or nature upon the Acquired Assets.

**4.04   Title to Acquired Assets; Encumbrances**.  Except as set forth on **Schedule 4.04**, Sellers have good, valid and marketable title to the Acquired Assets free and clear of any and all liens, claims, charges, encumbrances and security interests of any kind or nature.

**4.05   Litigation and Claims**.  Except as set forth on **Schedule 4.05**, to the best of Sellers' knowledge, there is no litigation pending with respect to the Acquired Assets.  For purposes hereof, Sellers' knowledge means the actual knowledge of Gene Torvend.

**4.06   Brokers and Finders**.  Sellers have not incurred any obligation or liability to any party for any brokerage fees, agent's commissions or finder's fees in connection with the transactions contemplated by this Agreement, other than a certain Agreement for Consultant Services with Donald J. Moore of Guilford, Connecticut.

## ARTICLE V
## REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Sellers that, as of the date hereof and as of the Closing:

**5.01   Organization**.  Purchaser is a limited partnership duly organized, validly existing and in good standing under the laws of the State of Delaware.  Purchaser is duly qualified or licensed to transact business as a foreign corporation in good standing in the State of Georgia.

- 7 -

**5.02    Authority and Binding Effect**.  This Agreement has been duly executed and delivered by duly authorized officers of Purchaser and constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms.  Purchaser has the corporate power and authority necessary to enter into and perform its obligations under this Agreement and to consummate the transactions contemplated hereby.

**5.03    No Conflict**.  Neither the execution, delivery and performance of this Agreement by Purchaser nor the consummation by Purchaser of the transactions contemplated hereby (a) will violate any provision of the limited partnership agreement of Purchaser, (b) will result in a violation by Purchaser of any law or order of any court or governmental unit to which Purchaser is subject, or (c) requires the consent of any third party.

**5.04    Brokers and Finders**.  Purchaser has not incurred any obligation or liability to any party for any brokerage fees, agent's commissions or finder's fees in connection with the transactions contemplated by this Agreement.

## ARTICLE VI
## COVENANTS AND ADDITIONAL AGREEMENTS OF SELLERS AND PURCHASER

**6.01    Consents and Approvals**.  Sellers agree to use their commercially reasonable efforts to obtain, prior to the Closing Date, the waiver, consent and approval of all persons whose waiver, consent or approval is required in order to consummate the transactions contemplated by this Agreement.

**6.02    Expenses**.  Each of Purchaser and Sellers shall be responsible for all the expenses and fees incurred by it in connection with the transactions contemplated hereby, except with respect to the Break-Up Fee in the event of an Alternative Transaction as set forth herein in Section 2.03.  Sellers shall pay all taxes relating to the transfer of the Acquired Assets to Purchaser and any fees and expenses in connection with the prepayment, release, satisfaction or removal of any liens affecting the Acquired Assets prior to the Closing Date.

**6.03    Further Assurances**. At any time and from time to time after the date of this Agreement, Sellers shall, at the request of Purchaser, take any and all actions reasonably necessary to fulfill Sellers' obligations hereunder, including executing and delivering such further instruments of conveyance, sale, transfer and assignment, and taking such other actions reasonably necessary or desirable to effectuate the transfer of the Acquired Assets to Purchaser.

**6.04    Tax Prorations**.

(a)    Real Property Taxes and Personal Property Taxes including, without limitation, accruals or prepayments thereof (all as individually defined below and collectively called the "Proration Items"), shall be prorated directly between Sellers and Purchaser as provided in this Section 6.04.

(b)    For purposes of this Section 6.04, the capitalized terms set forth below shall have the following meanings:

- 8 -

(i)     "Real Property Taxes" shall mean ad valorem taxes imposed upon any owned or leased real property or portion thereof included in the Acquired Assets, general or special assessments imposed with respect to such owned or leased real property, whether payable in full or by installments; and

(ii)    "Personal Property Taxes" shall mean ad valorem taxes, other than Real Property Taxes, imposed upon the Acquired Assets.

(c)     As soon as practicable after the Closing Date, all Real Property Taxes and Personal Property Taxes (including amounts owed pursuant to transferable state licenses applicable to the Acquired Assets and transferred to Purchaser hereunder) shall be apportioned to the Closing Date, and representatives of Sellers and Purchaser will examine all relevant Books and Records as of the Closing Date in order to make the determination of the apportionments, which determinations shall be calculated in accordance with past practices and initially based on the previous year's taxes to the extent information regarding the current tax period is not yet available. Payments in respect thereof shall be made to the appropriate party by check within thirty (30) days after such determination, except that payments for Real Property Taxes and Personal Property Taxes shall later be adjusted to reflect the current year's taxes when the tax bills are finally rendered. The parties shall fully cooperate with each other to avoid, to the extent legally possible, the payment of duplicate Personal Property Taxes, and each party shall furnish, at the request of the other, proof of payment of any Personal Property Taxes or other documentation which is a prerequisite to avoiding payment of a duplicate tax.

(d)     Sellers' apportioned amount shall include all taxes accrued or owing pre-Closing. Sellers shall determine the amount of Real Property Taxes and Personal Property Taxes accrued pre-Closing and shall either (i) escrow amounts sufficient to pay those taxes based on the previous tax year, which escrowed amounts shall be paid to Purchaser at Closing or the appropriate taxing authority when due or (ii) deduct the accrued pre-Closing taxes from the Cash Purchase Price to be paid by Purchaser at Closing.

**6.05    Access to Acquired Assets and Employees**. Prior to Closing, Sellers grant to Purchaser a non-exclusive license to enter Sellers' leased warehouse facility located at (i) 8 Harbor Road, South Burlington, VT 05403, (ii) 27 Industrial Drive, Londonberry, NH 03053, (iii) 196 Bridgeville Road, Monticello, NY 12701 and (iv) 8304 Sherwick Court, Jessup, MD 20794 ("Sellers' Facilities") during normal business hours as well as access to Sellers' employees.

**6.06    Condition of Acquired Assets**. Except as expressly set forth in this Agreement, the Acquired Assets are being sold "as is, where is" without any representation or warranty of any kind, either express or implied, including, without limitation, any representation or warranty as to the design, quality or condition of the Acquired Assets, any warranty of merchantability or fitness of the Acquired Assets for any particular purpose or as to any other matter relating to the Acquired Assets or any part thereof.

**6.07    Sellers' Deliveries**. To the extent not specifically provided for in the Sale Order, at Closing, Sellers shall deliver to Purchaser executed discharges, UCC terminations or other

such other written evidence as Purchaser may require in connection with the release, termination or discharge of any lien, charge, claim, encumbrance or security interest of any kind or nature that burdens any of the Acquired Assets prior to the Closing Date (the "Encumbrances"), if any.

6.08    **Real Property Lease**.  Prior to the Closing Date or the earlier termination of this Agreement pursuant to Article IX, Purchaser shall negotiate in good faith to cause SPR, LLC (the "Landlord") to enter into a lease of certain real property located at 8 Harbor Road, South Burlington, VT 05403 (the "New Real Property Lease"), which New Real Property Lease shall provide for the termination of, and release of Sellers and any of Sellers' guarantors from any and all obligations under, the current lease entered into on or about November 6, 2009 (the "Current Real Property Lease").

6.09    **Conduct of Business Prior to Closing**.  From the date hereof to the Closing Date, and except as required or contemplated by this Agreement, and except to the extent that Purchaser shall otherwise consent in writing and subject to the requirements and restrictions of the Bankruptcy Court proceedings, Sellers shall:

(a)    Continue to operate their business in all material respects in compliance with the Bankruptcy Code and any orders entered by the Bankruptcy Court in the Bankruptcy Cases;

(b)    Not sell or otherwise dispose of, or mortgage, pledge or encumber, any real or personal property or asset that would be an Acquired Asset hereunder;

(c)    Not waive or agree to waive any rights of material value relating to the Acquired Assets or allow to lapse or fail to keep in force any material license, permit, authorization or other material right relating thereto;

(d)    Not make or permit any material amendment or termination of any material contract, agreement or license included in the Acquired Assets;

(e)    Maintain the Acquired Assets in their present order and condition, reasonable wear and use excepted, and maintain all material policies of insurance covering the Acquired Assets in amounts and on terms substantially equivalent to those in effect on the date hereof;

(f)    Take reasonable steps to maintain the Intellectual Property and other intangible assets; and

(g)    Comply in all material respects with all laws applicable to the conduct of the business and the ownership of the Acquired Assets.

6.10    **Notification of Changes**.  From the date hereof to the Closing Date, Sellers shall make their management reasonably available to consult with Purchaser as to the management of Sellers' business and the Acquired Assets, and Sellers shall promptly notify Purchaser in writing

of any Material Adverse Change or any material damage to or material loss of the Acquired Assets taken as a whole.   As used herein, "Material Adverse Change" shall mean any circumstance regarding, change in or effect on the Sellers' business or the Acquired Assets that, individually or when taken together with all other related circumstances regarding, changes in or effects on the business or the Acquired Assets, is materially adverse to the condition (financial or otherwise), operations or liabilities of the business or the Acquired Assets.

**6.11**   **Phase I Report**.   Not less than fifteen (15) days prior to the Closing Date, Purchaser shall obtain a Phase I environmental audit report on any owned or leased real property included in the Acquired Assets (the "Environmental Audit Report").

## ARTICLE VII
## DELIVERY OF DOCUMENTS

**7.01**   **Delivery of Documents**.   At the Closing, the parties shall exchange all duly executed documents and other instruments required to consummate the transactions contemplated by this Agreement, including, but not limited to:

(a)   Bills of sale, deeds, assignments, transfers and other instruments of conveyance, as appropriate, all in form reasonably satisfactory to Purchaser and Sellers, with respect to the Acquired Assets and the Assumed Liabilities;

(b)   The certificates contemplated by Sections 8.01(a), (b) and (c) and 8.02(a) and (b);

(c)   A certified copy of resolutions of Sellers' board of directors authorizing the execution and delivery by Sellers of this Agreement and the consummation of the purchase and sale contemplated hereby;

(d)   The New Real Property Lease, duly executed by Landlord and Purchaser;

(e)   The Sale Order; and

(f)   An assignment and assumption agreement in form acceptable to Purchaser and duly executed by Sellers.

## ARTICLE VIII
## CONDITIONS PRECEDENT

**8.01**   **Conditions Precedent to Purchaser's Obligations**.   The obligation of Purchaser to consummate the transactions provided for in this Agreement is subject to the satisfaction of each of the following conditions on or before the Closing, any of which may be waived by Purchaser in its sole discretion:

(a)   All information required to be furnished or delivered by Sellers pursuant to this Agreement shall have been furnished or delivered as of the date hereof and as of the Closing Date, as required hereunder; the representations and warranties made by Sellers in

Article IV hereof shall be true and correct in all material respects as of the date of this Agreement and on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except that such representations and warranties may be untrue or incorrect as a result of actions or transactions expressly permitted by this Agreement or actions or transactions of Sellers made with the prior written consent of Purchaser); and Purchaser shall have received a certificate dated as of the Closing Date, executed by a duly authorized officer of Sellers, to such effect.

(b)     Sellers shall have duly performed in all material respects all of the covenants, agreements and conditions contained in this Agreement to be performed or satisfied by Sellers on or prior to the Closing Date, and Purchaser shall have received a certificate dated as of the Closing Date, executed by a duly authorized officer of Sellers, to such effect.

(c)     Purchaser shall have received from Sellers a certificate executed by the Secretary or Assistant Secretary of Sellers certifying (i) that Sellers' board of directors has approved and authorized this Agreement and each of the transactions contemplated hereby pursuant to the resolutions attached to such certificate, and (ii) that such resolutions have not been rescinded, revoked, modified or otherwise affected and remain in full force and effect.

(d)     The Sale Order shall have been entered by the Bankruptcy Court and shall not be stayed pending appeal or reversed.

(e)     The New Real Property Lease shall have been executed.

(f)     Purchaser shall be satisfied in its sole discretion with the results of the Environmental Audit Report.

(g)     A Material Adverse Change shall not have occurred between the date hereof and the Closing Date.

(h)     Sellers' business shall have continued operations in all material respects including full operation of Sellers' Facilities.

**8.02** **Conditions Precedent to Sellers' Obligations**.  The obligation of Sellers to consummate the transactions provided for in this Agreement is subject to the satisfaction of each of the following conditions on or before the Closing, any of which may be waived by Sellers in their sole discretion:

(a)     All information required to be furnished or delivered by Purchaser pursuant to this Agreement shall have been furnished or delivered as of the date hereof and as of the Closing Date, as required hereunder; the representations and warranties made by Sellers in Article IV hereof shall be true and correct in all material respects as of the date of this Agreement and on and as of the Closing Date with the same force and effect as though such representations and warranties had been made on and as of the Closing Date (except that such representations and warranties may be untrue or incorrect as a result of actions or transactions expressly permitted by this Agreement or actions or transactions of Purchaser made with the prior written

consent of Sellers); and Sellers shall have received a certificate dated as of the Closing Date, executed by a duly authorized officer of Purchaser, to such effect.

(b)     Purchaser shall have duly performed in all material respects all of the covenants, agreements and conditions contained in this Agreement to be performed or satisfied by Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate dated as of the Closing Date, executed by a duly authorized officer of Purchaser, to such effect.

(c)     The Sale Order shall have been entered by the Bankruptcy Court and shall not be stayed pending appeal or reversed.

(d)     The New Real Property Lease shall have been executed.

## <u>ARTICLE IX</u>
## <u>TERMINATION</u>

**9.01     <u>Method of Termination</u>**.  This Agreement may be terminated at any time prior to the Closing Date:

(a)     by Purchaser, if Sellers do not file the Petitions by October 21, 2013;

(b)     by Purchaser, if the Bidding Procedures and Sale Motion is not filed within one business day of the filing of the Petitions;

(c)     by Purchaser, if the hearing on the Bidding Procedures and Sale Motion is not held by November 4, 2013;

(d)     by Purchaser, if the Bankruptcy Court does not enter the Bidding Procedures Order within one business day of the hearing on the Bidding Procedures and Sale Motion;

(e)     by Purchaser, if the Sale Hearing is not held by November 19, 2013 and the Bankruptcy Court does not enter the Sale Order within one business day of such hearing;

(f)     by the mutual consent of Sellers and Purchaser;

(g)     by Sellers, if the Closing has not occurred by December 1, 2013, unless such Closing has been frustrated or made impossible by any act or failure to act by Sellers that is inconsistent with their obligations pursuant to this Agreement;

(h)     by Purchaser, if the Closing has not occurred by November 25, 2013, unless such Closing has been frustrated or made impossible by any act or failure to act by Purchaser that is inconsistent with its obligations pursuant to this Agreement; or

(i)     By Purchaser, if any of Sellers' Facilities cease operation or materially reduce operations; or

- 13 -

(j)    By Purchaser, if it is not satisfied in its sole discretion with the results of the Environmental Audit Report.

**9.02    Notice of Termination**.  Notice of termination of this Agreement shall be given by the party so terminating to the other party hereto in accordance with Section 10.02 of this Agreement.

**9.03    Effect of Termination**.  If this Agreement is terminated pursuant to Section 9.01 hereof, this Agreement shall (except as expressly set forth herein) become void and of no further force and effect, and, except as set forth in this Section 9.03, no party (or any of its officers, directors, members, managers, partners, employees, agents, or representatives) shall be liable to any other party for any loss as a result of such termination.  If the nonoccurrence of Closing is the direct or indirect result of a default of or breach by any party of its obligations hereunder, such defaulting or breaching party shall be fully liable to the other party hereto for any such breach or default.

## ARTICLE X
## MISCELLANEOUS

**10.01    Public Announcements**.  Neither Sellers nor any of their representatives shall make any public announcement with respect to this Agreement or the transaction contemplated hereby without the prior consent of Purchaser unless required by law or judicial process, in which case notification shall be given to Purchaser prior to such disclosure.

**10.02    Notices**.

(a)    All notices, requests, demands and other communications hereunder shall be (i) delivered by hand, (ii) mailed by registered or certified mail, return receipt requested, first class postage prepaid and properly addressed, (iii) sent by national overnight courier service, or (iv) sent by email to the parties or their assignees, addressed as follows:

      To Sellers:      Shelburne Plastics
      8 Harbor View Road
      South Burlington, VT 05403
      Attention: Gene Torvend
      Telephone: 802-658-6588
      Facsimile: 802-658-6596
      GTorvend@shelburneplastics.com

with copies (which shall not constitute notice) to:

      Raymond J. Obuchowski
      Obuchowski & Emens-Butler, PC
      PO Box 60
      Bethel, VT 05032

- 14 -

Telephone: 802-234-6244
Facsimile: 802-234-6245
Ray@oeblaw.com

Michael G. Furlong
Sheehey Furlong & Behm P.C.
30 Main Street
PO Box 66
Burlington, VT  05402-0066
Telephone: 802-864-9891
Facsimile: 802-864-6815
mfurlong@sheeheyvt.com

To Purchaser:        Consolidated Container Company
                     3101 Towercreek Parkway, Suite 300
                     Atlanta, GA 30339
                     Attn: General Counsel
                     Telephone: (678) 742-4600
                     Facsimile: (678) 742-4758
                     Louis.Lettes@cccllc.com

with a copy (which shall not constitute notice) to:

                     Alston & Bird LLP
                     One Atlantic Center
                     1201 West Peachtree Street
                     Atlanta, GA 30309-3424
                     Attn:  Jason H. Watson
                     Telephone: (404) 881-7000
                     Facsimile: (404) 881-7777
                     jason.watson@alston.com

(b)      All notices, requests, instructions or documents given to any party in accordance with this Section 10.02 shall be deemed to have been given (i) on the date of receipt if delivered by hand, overnight courier service or if sent by facsimile, graphic scanning or other telegraphic communications equipment or (ii) on the date three (3) business days after depositing with the United States Postal Service if mailed by United States registered or certified mail, return receipt requested, first class postage prepaid and properly addressed.

(c)      Any party hereto may change its address specified for notices herein by designating a new address by notice in accordance with this Section 10.02.

**10.03**  **Entire Agreement**.  This Agreement, the Schedules and the Exhibits constitute the entire agreement between the parties relating to the subject matter hereof and thereof and

supersede all prior oral and written, and all contemporaneous oral negotiations, discussions, writings and agreements relating to the subject matter of this Agreement.  The terms of this Agreement control and supersede any course of performance or usage of the trade that is inconsistent with such terms.

**10.04   Modifications, Amendments and Waivers**.  The failure or delay of any party at any time or times to require performance of any provision of this Agreement shall in no manner affect its right to enforce that provision.  No single or partial waiver by any party of any condition of this Agreement, or the breach of any term, agreement or covenant or the inaccuracy of any representation or warranty of this Agreement, whether by conduct or otherwise, in any one or more instances shall be construed or deemed to be a further or continuing waiver of any such condition, breach or inaccuracy or a waiver of any other condition, breach or inaccuracy.

**10.05   Successors and Assigns**.  This Agreement shall be binding upon and shall inure to the benefit of and be enforceable by the parties hereto, and their respective estates, successors, legal or personal representatives, heirs, distributees, designees and assigns, but no assignment shall relieve any party of the obligations hereunder.  This Agreement cannot be assigned by any party without the prior written consent of the other parties hereto; provided, however, that Purchaser may assign this Agreement to any entity controlling, controlled by or under common control with Purchaser.

**10.06   Severability**.  Should any one or more of the provisions of this Agreement be determined to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions hereof shall not in any way be affected or impaired thereby.

**10.07   Choice of Law**.  This Agreement shall be construed, interpreted and the rights of the parties determined in accordance with the laws of the State of Georgia applicable to contracts made and wholly performed within that state.

**10.08   No Third Party Beneficiaries**.  Nothing in this Agreement, whether express or implied, is intended or shall be construed to confer upon or give to any person, other than the parties hereto, any rights, remedies or other benefits under or by reason of this Agreement.

**10.09   Counterparts**.  This Agreement may be executed in any number of counterparts, each of which shall be an original; but all of such counterparts shall together constitute one and the same instrument.

IN WITNESS WHEREOF, Purchaser and Sellers have duly executed this Agreement as of the date first above written.

*{Signatures on Following Pages}*

**SELLERS:**

**Plastic Technologies of Maryland, Inc.**

By: _Eugene F. Tennel_

Title: _PRESIDENT_

**Plastic Technologies of Vermont, Inc.**

By: _Eugene F. Tennel_

Title: _PRESIDENT_

**Plastic Technologies of New York, LLC**

By: _Eugene F. Tennel_

Title: _PRESIDENT_

**PURCHASER:**

**Consolidated Container Company LP**

By: _____

Title: _____

## Schedule 1.01(a)

See Attached

Case 13-10729  Doc  9  Filed 10/21/13  Entered  10/21/13 09:13:12

SHELBURNE, DESC 1G3 – 00C2                    DESC MAIN DOCUMENT Page 63 of 91                    SCHEDULE "D"
JESSUP, MD -- DESKTOP      Desc   Main Document        Page     63 of 91

BLOW MOLDING

| | | | | | JESSUP FIXED ASSET SCHEDULE |
|---|---|---|---|---|---|
| Qty. | Age | Item | Model | Serial No. | Description |
| 1 | 197X | UNILOY | 250R1 | 250R1-2887 | BLOW MOLDING MACHINE, 5 HEAD, FOREMOST VACUUM SYSTEM, UNILOY SHUTTLE/TAIL PULLER, HOT KNIFE TRIMMER, ASI LEAK DETECTOR, TRANSFER CONVEYOR SYSTEM, SEMI AUTO BAGGER, FOREMOST GRINDER |
| 1 | | UNILOY | 5730 | 2213 | BLOW MOLDING MACHINE, 4 HEAD, UNILOY COOLING BED, UNILOY SINGLE STATION TRIMMER, FOREMOST VACUUM SYSTEM, AI8S LEAK DETECTOR, FOREMOST GRINDER |
| 1 | | UNILOY | 350R2 | 350R2-2712 | BLOW MOLDING MACHINE, 4 HEAD, UNILOY COOLING BED, UNILOY SINGLE STATION TRIMMER, FOREMOST VACUUM SYSTEM, AIS LEAK DETECTOR, UNILOY IN-LINE FLAMER, UNILOY SEMI AUTO BAGGER/TRANSFER CONVEYOR, FOREMOST GRINDER, UPGRADED GLYCOL HIGH EFFICIENCY SCREW AND BARREL WITH HEATER BANDS/ COOLING ZONE BLOWERS/THERMOCOUPLES/WATER COOLED FEED THROAT |
| 1 | | UNILOY | 5730 | 2212 | BLOW MOLDING MACHINE, 5 HEAD, UNILOY COOLING BED, UNILOY SINGLE STATION TRIMMER, FOREMOST VACUUM SYSTEM, AIS LEAK DETECTOR, IDEAS IN MOTION AUTO BAGGER |
| 1 | 1992 | LIBERTY | RS-350-10HD | 890S2 | BLOW MOLDING MACHINE, 10 HEAD, LIBERTY TRANSFER SHUTTLE, LIBERTY TAIL PULLER, FOREMOST VACUUM SYSTEM, LIBERTY HOT KNIFE TRIMMER, EMHART LEAK DETECTOR, TRANSFER CONVEYOR, SEMI AUTO BAGGER |
| 1 | | CONVEYOR SYST. | | | AERIAL CONVEYOR SYSTEMS, 400 FT. |
| 2 | | BAGGER | 2068-2 | | PRODUCT AUTOMATIC BAGGER STATIONS |
| 1 | | PACKING STATION | | | SINGLE STATION PACKING STATION |
| 3 | | BAGGER | | | DOUBLE TIER BAGGERS |
| 1 | | BOX ERECTOR | | | DURABLE CASE ERECTOR |
| 1 | | TRANE | CGWA100 | L7811212 | WATER COOLED CHILLER, 100 TON |
| 1 | | TRANE | 30HK-060-D-610 | N1304Q03690 | WATER COOLED CHILLER, 100 TON |
| 1 | | TRANE | AB20W460-2FTRAN | Z050590-2 | WATER COOLED CHILLER, 100 TON |
| 1 | | CAPITAL | 70-3-7662 | PJF-750 | WATER COOLED PORTABLE CHILLER, 15 TON |
| 1 | | AEC | WC-15-D/B | 74M078 | WATER COOLED PORTABLE CHILLER, 15 TON |
| 1 | | AEC | WC-15-D/B | 732832 | WATER COOLED PORTABLE CHILLER, 15 TON |
| 1 | | ICE WAGON | 150AC | | PORTABLE CHILLER |
| 1 | | CONAIR | CH4 | | WATER COOLED CHILLER UNIT |
| 1 | | SULLAIR | | | AIR COMPRESSOR, 75 HP, RECIPROCATING |
| 1 | | QUINCY | QS1235ANN | 3 32190 | AIR COMPRESSOR |
| 1 | | HANKINSON | 80700 | 032A-6-8906A | AIR DRYER |
| 1 | | CONAIR | CGWA100 | L78B11212 | VACUUM PUMP, 5 HP |
| 1 | | CONAIR | | | VACUUM PUMP, 7.5 HP |
| 1 | | FOREMOST | | | VACUUM PUMP, 10 HP |
| 2 | | SILOS | | | METAL MATERIAL STORAGE SILOS |
| 1 | | CONAIR | 10043010 | 8-0326 | BATCH WEIGHER AND BLENDER |
| 1 | | CONAIR | AUTO COLOR 2 | | BATCH WEIGHER AND MIXER |
| 1 | | POLYMER | 1120SP | 1120SP11977 | GRANULATOR, 11 x 20 CUTTING CHAMBER |
| 1 | | FOREMOST | DI-2 | 24293 | GRANULATOR |
| 2 | | GRANUTEC | | | GRINDERS, (ASSUME 7.5 HP) |
| 1 | | LOT | | | MISCELLANEOUS SHOP EQUIPMENT INCLUDING BUT MOT LIMITED TO; |
| | | BRIDGEPORT | | 12/BR/90984 | VERTICAL MILLING MACHINE, 9" X 92" |
| | | SOUTHBEND | 17" | CL-170 | LATHE, 17" TURN-NADO |
| | | DAYTON | 16 1/2" | | DRILL PRESS |
| | | CRAFTSMAN | 15" | | DRILL PRESS |
| | | DAYTON | ZAC30A | | METAL BRAKE |
| | | MISC. | 9518879 | 870343 | HORIZONTAL BAND SAW |

BLOW MOLDING

| Qty. | Age | Item | Model | Serial No. | Description |
|------|-----|------|-------|-----------|-------------|
| | | CRAFTSMAN | 12" | | VERTICAL BAND PRESS |
| | | MILWAUKEE | 14" | | METAL CHOP SAW |
| | | DAYTON | 6Y001 | | BELT/DISC SANDER/GRINDER |
| | | DAYTON | 4Z909B | | BENCH GRINDERS |
| | | CABINET | | | SAND BLAST CABINET |
| | | AIR COMPRESSOR | | | PORTABLE AIR COMPRESSOR |
| | | SHOP PRESS | | | 12 TON |
| | | VESTILE | | | 1 TON TRIPOD LIFT |
| | | MILLER | EONO O TWIN | | STICK WELDER |
| | | FIREBOX | | | WIRE WELDER AND OXY/ACETYLENE TORCH SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD DAIRY HALF GALLON BOTTLE MOLD SET |
| 1 | | 4 CAVITY | | | 4 CAVITY STANDARD DAIRY HALF GALLON BOTTLE MOLD SET |
| 1 | | 4 CAVITY | | | 4 CAVITY STANDARD DAIRY GALLON BOTTLE MOLD SET |
| 1 | | 4 CAVITY | | | 4 CAVITY STANDARD DAIRY GALLON BOTTLE MOLD SET |
| 1 | | 4 CAVITY | | | 4 CAVITY STANDARD  DAIRY INDUSTRIAL GALLON BOTTLE MOLD SET |
| 1 | | 4 CAVITY | | | 4 CAVITY STANDARD SQUAT QUART BOTTLE MOLD SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD NON HANDLED TALL SQUARE QUART BOTTLE MOLD SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD  NON HANDLED TALL ROUND G  QUART BOTTLE MOLD SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD ROUND G QUART BOTTLE MOLD SET |
| 1 | | 10 CAVITY | | | 10 CAVITY STANDARD OCTAGON 8 OZ. BOTTLE MOLD SET |
| 1 | | 10 CAVITY | | | 10 CAVITY STANDARD ROUND  12 OZ. BOTTLE MOLD SET |
| 1 | | 10 CAVITY | | | 10 CAVITY STANDARD ROUND 14 OZ. BOTTLE MOLD SET |
| 1 | | 10 CAVITY | | | 10 CAVITY STANDARD ROUND CONVERTIBLE 8 OZ., AND 16 OZ. BOTTLE MOLD SET |
| 1 | | 10 CAVITY | | | 10 CAVITY STANDARD ROUND CONVERTIBLE 16 OZ. AND 20 OZ. BOTTLE MOLD SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD 16 OZ. BULLET BOTTLE MOLD SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD 16 OZ. DECANTER BOTTLE MOLD SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD 10 OZ. MM BOTTLE MOLD SET |
| 1 | | 5 CAVITY | | | 5 CAVITY STANDARD QUART MM BOTTLE MOLD SET |
| 1 | | 4 CAVITY | | | 4 CAVITY STANDARD FLUTED INDUSTRIAL GALLON BOTTLE MOLD SET |
| 1 | | 4 CAVITY | | | 4 CAVITY STANDARD DAIRY (800005) GALLON BOTTLE MOLD SET |

BLOW MOLDING

| Qty. | Age | Item | Model | Serial No. | Description |
|------|-----|------|-------|-----------|-------------|
| | | | | | **BURLINGTON FIXED ASSET SCHEDULE** |
| | | | | | **LINE #1** |
| 1 | 1984 | UNILOY | 2016RS | 3432 | RECIPROCATING BLOW MOLDING MACHINE, 2 HEAD (WAS 4), RELAY CONTROLS WITH DIGITAL UPGRADE FOR HEATER WITH SHUTTLE ARM TO TRANSFER TO INCLINE CONVEYOR, WITH IN HOUSE LEAK TESTER & TRANSFER CONVEYOR |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 1 | | EMI | | | CONVEYOR, HORIZONTAL TO INCLINE, 10" WIDE x 6' LONG |
| 1 | | EMI | | | CONVEYOR, INCLINE, 12" WIDE x 10' LONG |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH ACCUMULATION TABLE |
| | | | | | **LINE #2** |
| 1 | 1979 | UNILOY | 2016 | 3075 | RECIPROCATING BLOW MOLDING MACHINE, 2 HEAD, RELAY CONTROL WITH DIGITAL HEATER CONTROLLER, SHUTTLE ARM TO BOTTLE CONVEYOR, TRIM STATION FOR TOP & TAILS, LEAK DETECTOR, CONVEYOR |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 1 | | EMI | | | CONVEYOR, INCLINE, 12" WIDE x 10' LONG |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH ACCUMULATION TABLE |
| | | | | | **LINE #3** |
| 1 | 1979 | UNILOY | 2014 | 3071 | RECIPROCATING BLOW MOLDING MACHINE, 3 HEADS, RELAY CONTROLS WITH DIGITAL HEATER CONTROLS, TRANSFER SWING ARM TO INLINE 8' CONVEYOR, TRIM STATION & LEAK TESTER |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 1 | 20XX | EMI | RMC-12-12-20 | M-1666 | CONVEYOR, INCLINE TO GRINDER |
| 1 | 199X | POLYMER SYSTEMS | 1120SP | 1120-92-7 | GRINDER, 11" x 20" CUTTING CHAMBER, 20 HP |
| 1 | | | | | LABELER, DUAL SIDE, MADE IN HOUSE |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 48" x 72" ACCUMULATION TABLE |
| | | | | | **LINE #4** |
| 1 | 1979 | UNILOY | 2014 | 2831 | RECIPROCATING BLOW MOLDING MACHINE, 4 HEADS, UNILOY TRANSFER SHUTTLE ARM, TRIM STATION, COOLING SECTION, LEAK TESTER |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 2 | | EMI | RMC-12-12-20 | M-1404, N/A | CONVEYOR, 8" WIDE x 12' LONG, INCLINE TO GRINDER |
| 1 | | AIS CONTAINER HANDLING | AUTO ADJUST II | 10386 | LEAK TESTER |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 48" x 60" ACCUMULATION TABLE |
| | | | | | **LINE #5** |
| 1 | 1991 | UNILOY | 2016 | 4248 | RECIPROCATING BLOW MOLDING MACHINE, 3 HEADS, ADDED NEW A/B DIGITAL CONTROL & DIGITAL HEATER CONTROLS, UNILOY TRANSFER SHUTTLE ARM, TRIM STATION, COOLING SECTION, LEAK TESTER |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 2 | | EMI | RMC-12-12-20 | M-1404, N/A | CONVEYOR, 8" WIDE x 12' LONG, INCLINE TO GRINDER |
| 1 | | AIS CONTAINER HANDLING | AUTO ADJUST II | 10386 | CONVEYOR TO LEAK TESTER |
| 1 | 199X | CUMBERLAND | 8X12 | 72400-88538 | GRINDER, 8" x 12" CUTTING CHAMBER, 5 HP, 3 KNIVES |
| 1 | 2002 | SLEEVECO | SL-1800 | 200239 | LABELER |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 10' ACCUMULATION TABLE |
| | | | | | **LINE #6** |
| 1 | 1992 | ROCHELEAU | SPB-2 | SPB-92-223 | RECIPROCATING BLOW MOLDING MACHINE, 4 HEADS, RELAY CONTROL & DIGITAL HEATER CONTROLS, TRANSFER SHUTTLE ARM, TRIM STATION, (2) STATION LEAK TESTER |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 1 | | EMI | | | CONVEYOR, 8" WIDE X 10' LONG, INCLINE TO GRINDER (TAILS) |
| 1 | | EMI | | | CONVEYOR, 12" WIDE X 10' LONG, INCLINE TO GRINDER |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 38" x 60" ACCUMULATION TABLE |
| 1 | 199X | CUMBERLAND | 8X12 | 72400-9362 | GRINDER, 8" x 12" CUTTING CHAMBER, 5 HP, 3 KNIVES |
| | | | | | **LINE #7** |
| 1 | 1993 | ROCHELEAU | SPB-2 | SPB-92-232 | RECIPROCATING BLOW MOLDING MACHINE, 4 HEADS, RELAY CONTROL & DIGITAL HEATER CONTROLS, TRANSFER SHUTTLE ARM, TRIM STATION, (2) STATION LEAK TESTER |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 1 | | EMI | | | CONVEYOR, 6" WIDE x 10' LONG, HORIZONTAL TO GRINDER (TAILS) |
| 1 | | EMI | | | CONVEYOR, 6" WIDE X 10' LONG, INCLINE TO GRINDER |
| 1 | | SLEEVECO | ST=1100 | 5-95019 | LABEL STATION, SINGLE BOTTLE |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 32" x 40" ACCUMULATION TABLE |
| 1 | 199X | CUMBERLAND | 8X12 | 72150-88040 | GRINDER, 8" x 12" CUTTING CHAMBER, 5 HP |
| | | | | | **LINE #8** |
| 1 | 1993 | ROCHELEAU | SPB-2 | SPB-92-233 | RECIPROCATING BLOW MOLDING MACHINE, 4 HEADS, RELAY CONTROL & DIGITAL HEATER CONTROLS, TRANSFER SHUTTLE ARM, TRIM STATION, CONVEYORS |
| 1 | | CONAIR | | | VACUUM RECEIVER |

Case 13-10729   Doc   9   Filed 10/21/13   Entered 10/21/13 09:13:13   SCHEDULE "A"
SHELBURNE, ASSOCIATES
BURLINGTON, VT              Desc   Main Document        Page      66 of 91

SEPTEMBER 17, 2013

**BLOW MOLDING**

| Qty. | Age | Item | Model | Serial No. | Description |
|---|---|---|---|---|---|
| 1 | | EMI | | | CONVEYOR, 4" WIDE X 10' LONG, HORIZONTAL TO GRINDER (TAILS) |
| 1 | | EMI | | | CONVEYOR, 10" WIDE X 10' LONG, INCLINE TO GRINDER |
| 1 | | AIS CONTAINER HANDLING | AUTO ADJUST III | 10434 | LEAK TESTER |
| 1 | 199X | JDA PACKAGING PRO-LABEL | WLA-2 | 71110 | LABEL STATION |
| | | | | | LINE #9 |
| 1 | 1995 | UNILOY | 2016 | 4681 | RECIPROCATING BLOW MOLDING MACHINE, 3 HEADS, WITH TRANSFER ARM, TOP & TAIL TRIM STATION, BOTTLE TRANSFER CONVEYORS |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 1 | | EMI | | | CONVEYOR, 6" WIDE X 10' LONG, INCLINE TO GRINDER |
| 1 | 20XX | | | | ROLL ON LABELER FOR 1/2 GALLON CONTAINER (NO NAME ON UNIT) |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 36" x 72" ACCUMULATION TABLE |
| 1 | | GRANUTEC | TFG1212.75 | 598-3232 | GRINDER, 12" x 12" CUTTING CHAMBER, 7.5 HP |
| | | | | | LINE #11 |
| 1 | 1997 | ROCHELEAU | SPB-2 | SPB-97-254 | RECIPROCATING BLOW MOLDING MACHINE, 4 HEADS, RELAY CONTROL & DIGITAL HEATER CONTROLS, TRANSFER SHUTTLE ARM, TRIM STATION, (2) STATION LEAK TESTER, CONVEYORS |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 2 | | EMI | | | CONVEYOR, 6" WIDE X 10' LONG, HORIZONTAL TO GRINDER (TAILS) |
| 1 | | | | | LABEL STATION, DUAL HEAD, HORIZONTAL ROLL STYLE |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 48" x 48" ACCUMULATION TABLE |
| | | | | | LINE #14 |
| 1 | 1997 | ROCHELEAU | SPB-2 | SPB-97-254 | RECIPROCATING BLOW MOLDING MACHINE, SINGLE HEAD, RELAY CONTROL & DIGITAL HEATER CONTROLS, 50 LB STEEL HOPPER, HEAT SHRINK TUNNEL (IN HOUSE), CONVEYORS |
| 1 | 20XX | AIS CONTAINER HANDLING | AUTO ADJUST III | 10464 | LEAK TESTER, SINGLE STATION |
| 1 | 199X | MTM SYSTEMS | 0725 | 2763-A | HOT KNIFE TRIMMER |
| 1 | | EMI | | | CONVEYOR, 6" x 10' HORIZONTAL |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 48" x 60" ACCUMULATION TABLE |
| 1 | | CONAIR | | | BLENDING STATION, OVER SURGE BIN, AUX MIXER TYPE WITH 2 VACUUM RECEIVERS |
| 1 | | PPE | | | SURGE BIN, PLASTIC, 500 LB |
| | | | | | LINE #15 |
| 1 | 2003 | ROCHELEAU | R8-25 | RS25-03-40 | RECIPROCATING BLOW MOLDING MACHINE,8 HEAD, E700 CONTROL, HOPPER, PARTS LOCATOR CHUTE, TRANSFER CONVEYORS TO TRIMMER, HOT KNIFE TRIMMING STATION, CONVEYORS |
| 1 | 1999 | EMHART POWERS | 975DL | 4058 | LEAK TESTER, SINGLE STATION |
| 1 | | CUMBERLAND | 10X18 | CA025200-01001 | GRINDER, 10" x 18" CUTTING CHAMBER, 7.5 HP |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 48" x 60" ACCUMULATION TABLE |
| 1 | | CONAIR | | | BLENDING STATION, OVER SURGE BIN, AUX MIXER TYPE WITH 2 VACUUM RECEIVERS |
| 1 | 2013 | PPE | HL5 | HL5130896512 | PROPORTIONAL HOPPER LOADER |
| | | | | | LINE #16 |
| 1 | 1987 | UNILOY | 250R1 | 250R1SPT2887 | RECIPROCATING BLOW MOLDING MACHINE, 5 HEADS, RELAY CONTROLS WITH DIGITAL HEATER CONTROL, WITH SHUTTLE DROP TO UNILOY MODEL 10060  TAIL TRIMMER TO HOT KNIFE TOP TRIMMER, CONVEYORS |
| 1 | | CONAIR | | | VACUUM RECEIVER |
| 1 | 20XX | AIS CONTAINER HANDLING | AUTO ADJUST III | 10425 | LEAK TESTER, SINGLE STATION |
| 1 | | | | | SEMI-AUTOMATIC BAGGER WITH 48" x 72" ACCUMULATION TABLE  (NOT YET INSTALLED BUT OPERATIONAL) |
| 1 | | CUMBERLAND | 10X12 | 3998293202 | GRINDER, 10" x 12" CUTTING CHAMBER, 7.5 HP |
| 1 | | CONAIR | DB | 164819 | VACUUM LOADER |
| 1 | | SURGE BIN | | 49825 | DAY SURGE BIN, 1/2 GAYLORD,  WITH CONAIR DL-15 LOADER WITH (6) TAKE OFF PORTS & CYCLONE TANK |
| 1 | 199X | CARRIER | 30GN-190-6 FC | 4597F0687 | CHILLER, 190 TON, OUTDOOR (6 CIRCUITS) |
| 1 | 1997 | BALTIMORE AIR COIL | VC1-N417 | 97813211 | COOLING TOWER, 200 TON |
| 1 | 199X | TECO CHILL | 350 | 20080 | CHILLER 350 TON WITH OEM DIGITAL CONTROLLER |
| 1 | 1998 | APV | A055MG510 | 34247.1 | HEAT EXCHANGER UNIT (DUAL) |
| 1 | 199X | PUMP TANK | | | PUMP TANK SET WITH TOWER AND CHILLER SIDES, (2) 30 HP & (2) 15 HP PUMPS |
| 1 | 199X | SULLAIR | LS20-SFI/A/SVL | 003-123273 | AIR COMPRESSOR, 100 HP, WITH 400 GALLON AIR STORAGE TANK |
| 1 | 1998 | HANKINSON | PR-500-460 | PR500A-2-9802-8N | AIR DRYER, 200 PSI MAX |
| 1 | | KELLOGG-AMERICAN | A462TVX | AS14649 | AIR COMPRESSOR, 25 HP, 200 GAL TANK |
| 1 | | SULLAIR | 12BS-50L-ACAC | 003-817726 | AIR COMPRESSOR, 50 HP, WITH 300 GALLON AIR STORAGE TANK |
| 1 | | CONAIR | 10042802 | 8-0201 | BLENDER, (2) COMPONENT, ON 500 LB SURGE BIN |
| 1 | | CONAIR | 700-037-04 | 3B0394 | VACUUM PUMP AND FILTER UNIT, 5 HP |
| 3 | 199X | CONAIR | 500/DL-12 | 581932 | SURGE BIN, 500 LB WITH DL-12 LOADER ON STAND FOR GAYLORD LOADING |

**BLOW MOLDING**

| Qty. | Age | Item | Model | Serial No. | Description |
|---|---|---|---|---|---|
| 1 | 2000 | CONAIR | CPABIDB000000 | B56923 | POWERFILL INTEGRATED VACUUM SYSTEM |
| 4 | | IMCS | | | SILOS, RESIN STORAGE, 65,000 LBS CAP (EACH) |
| 1 | 198X | CONAIR | 10043010 | 3A0512 | BLENDER |
| 1 | 1997 | GRANUTEC | TFG6810-5 | 897-3063 | GRINDER, 8" x 10" CUTTING CHAMBER, 5 HP, TOP & SIDE FEED, 3 KNIFE |
| 1 | 199X | CUMBERLAND | 812 | 72400-94572 | GRINDER, 8" x 10" CUTTING CHAMBER, 5 HP |
| 1 | 199X | GRANUTEC | TFG810.5 | 697.3062 | GRINDER, 8" x 10" CUTTING CHAMBER, 5 HP, 3 KNIVES |
| | | | | | |
| 1 | | FREDERICK | 1836 | 47-3344 | SHEETMETAL BRAKE, 48" WIDE, 0.125 MAX THICKNESS |
| 1 | 2004 | | 130-5061 | 0403324816-73 | SHEETMETAL BRAKE, 48" WIDE |
| 1 | 1998 | MSC | 9514639 | 9846376 | BAND SAW, VERTICAL, WITH WELDER |
| 1 | 1998 | CAROLINA | CP-100 | 6620 | HYDRAULIC PRESS, 20 0TON CAP, 24" WIDE |
| 1 | 199X | LEBLOND MAKINO | | 14C-838 | ENGINE LATHE, 48" BED, ACU-RITE DRO |
| | | | | | |
| 1 | | CAROLINA | DH10 | 45875 | CUTOFF SAW, 10" |
| 1 | 199X | BROWN & SHARPE | 612 MASTER | 523-35-184 | SURFACE GRINDER, 6" x 12" MAGNETIC CHUCK |
| | | | | | |
| 1 | | BALDOR | 623E | W985 | BENCH GRINDER, 1/3 HP |
| 1 | | DAYTON | 6Y001 | 9807 | |
| 1 | | CRAFTSMAN | 137.322915 | RAN1005 | DRILL PRESS, 15" |
| 1 | 198X | BRIDGEPORT | | 230919 | MILLING MACHINE, 1 HP, 48" TABLE WITH VICE |
| 1 | 199X | BRIDGEPORT | | 249034 | MILLING MACHINE, 2 HP, 48" TABLE WITH VICE, VARIABLE SPEED HEAD, ACU-RITE III DRO, (3) AXES |
| 1 | 1992 | BRIDGEPORT | 308 DISCOVERY | 308-090 | CNC MACHINING CENTER, 18" x 36" x 14" HIGH CAP, 8 POSITION TOOL CHANGER, SX-15 CONTROL |
| 1 | | CRAFTSMAN | 319.211.260 | B9806 | BENCH GRINDER, 6", 1/3 HP |
| 1 | | ROCK OF AGES | | 5999-379 | SURFACE PLATE, 24" x 48" |
| 1 | | MILLER | SYNCROWAVE 250 | JK632878 | TIG WELDER |
| 1 | 1997 | AEROQUIP | PROCRIMP 1380 | 0618 | HOSE CRIMP MACHINE |
| 1 | | DAYTON | 2AC30A | | SHEAR, 36" WIDE |
| 1 | | CHICAGO ELECTRIC | | | PARTS WASHER |
| 1 | | LOT | | | LOT OF SHOP GAUGES AND TOOLS |
| 1 | 2009 | J&L METROLOGY | FC14 | 85001 | COMPARATOR, WITH JONES & LAMSON REFLECTION ATTACHMENT, QUADRA-CHEK 100 DIGITAL READOUT |
| 1 | 1978 | EMCO | PD-13 | 39114 | DRILL PRESS, 1/2 HP |
| 1 | 197X | BRIDGEPORT | | 17475 | MILLING MACHINE, 1 HP |
| 1 | | GUYSON FINISHING SYSTEM | F-500 | M2903 | SAND BLAST CABINET |
| 1 | | AMERICAN SCALE & CONVEYOR | 24" x 30' | | CONVEYOR, 24" WIFE x 30' LONG, BOX TRANSPORT TO SECOND FLOOR |
| 1 | 1994 | TRANSCELL | TI-500E | 94-080A2 | SCALE, PLATFORM, 60" x 60" |
| 1 | | TRIMMER | | | TRIMMER, HOT KNIFE, 36" (SPARE) |
| 1 | | LABELER | | | LABELER, ADJUSTABLE, 14" SPOOL DIA |
| 1 | 199X | HUNKAR | 311 SERIES | 4040151 | 4 ZONE HOT RUNNER CONTROL |
| 1 | | EMI | | | CONVEYOR, 16" WIDE x 10' LONG |
| 1 | | IDEAS IN MOTION | | | ACCUMULATOR/BAGGER, SEMI-AUTO (NOT IN USE, IN STORAGE) |
| 1 | | ROACH | | | CONVEYOR, 36' x 10', INCLINE |
| 1 | 197X | SUNNEN | | | HONING MACHINE |
| 1 | | LABELER | | | LABELER, 2 SPOOL, 14" MAX DIA SPOOL |
| 1 | | SHRINK WRAPPER | | | SHRINK WRAPPER, 8' VERTICAL TRAVEL, 1 AXIS, 2 POSITION |
| 200 | | PALLET RACKS | | | PALLET RACKING, 200 POSITIONS |
| 1 | | | | | PALLET JACK |
| 2 | | LIFT TABLE | HYD-10 | | LIFT TABLE, 880 LB CAP, 24" X 36" TABLE |
| 1 | 199X | TOYOTA | 7FGCU15 | 66000 | FORKLIFT, LP GAS, 2500 LB, WITH SIDE SHIFT |
| | | | | | |
| 1 | | 4 CAV | 4035 | | 4 CAVITY MOLD FOR 16 OZ OBLONG BOTTLE |
| 1 | | 4 CAV | 6348 | | 4 MOLD CAVITIES FOR 32 OZ T-QUART HANDLE (HOOD) |
| 1 | | 1 CAV | 6678 | | 1 CAVITY MOLD FOR 90 ML THERMO ORION |
| 1 | | 1 CAV | 6678 | | 1 CAVITY MOLD FOR 350 ML THERMO ORION |
| 1 | | 1 CAV | 6679 | | 1 CAVITY MOLD FOR 650 ML THERMO ORION |
| 1 | | 3 CAV | 6736 | | 3 MOLD CAVITIES FOR 32 OZ HOOD T-QUART |
| 1 | | 4 CAV | 8050 | | 4 MOLD CAVITIES FOR GALLON SQUARE WINDSHIELD WASHER |
| 1 | | 4 CAV | 8057 | | 4 MOLD CAVITIES FOR 96 OZ |
| 1 | | 3 CAV | 8060 | | 3 MOLD CAVITIES FOR GALLON SQUARE |
| 1 | | 3 CAV | 60246 | | 3 MOLD CAVITIES FOR 32 OZ I-LIT. SQUAT QUART |
| | | 6 CAV | 70219 | | 6 MOLD CAVITIES FOR 1/2 GALLON STANDARD |
| | | 12 CAV | 80171 | | 12 MOLD CAVITIES FOR GALLON RESIN SAVER |
| 1 | | 4 CAV | 80701 | | 4 CAVITY MOLD FOR 4 LITER SPACE SAVER |
| | | 3 CAV | HONEY | | 4 MOLD CAVITIES FOR 5 LB HONEY |
| 1 | | 4 CAV | DAIRD | | 4 CAVITY MOLD FOR 16 OZ MONUMENT PINT |

**BLOW MOLDING**

| Qty. | Age | Item | Model | Serial No. | Description |
|------|-----|------|-------|------------|-------------|
| 1 | | 4 CAV | SQJOD | | 4 CAVITY MOLD FOR 8 OZ SQUARE (JODOIN) |
| | | 9 CAV | SQUAR | | 9 MOLD CAVITIES FOR 16 OZ SQUARE PINT (UNILOY) |
| 1 | | 4 CAV | SQUAR | | 4 CAVITY MOLD FOR 8-10-12-16 OZ SQUARE |
| 1 | | 4 CAV | ROUND | | 4 CAVITY MOLD FOR 8-10-12 OZ TEDS PINTS |
| | | 5 CAV | GALLI | | 5 MOLD CAVITIES FOR 32 OZ GALLIKER QUART |
| ▮ | | ▮▮▮▮ | ▮▮▮▮ | | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| 1 | | 4 CAV | TSQNH | | 4 CAVITY MOLD FOR 32 OZ/1 LIT T-QUART HANDLE |
| 1 | | 4 CAV | SQUAR | | 4 CAVITY MOLD FOR 16 OZ SQUARE PINT |
| 1 | | 4 CAV | BULLE | | 4 CAVITY MOLD FOR 16-20 OZ BULLET NOSE ROUND |
| 1 | | 4 CAV | BULLE | | 4 CAVITY MOLD FOR 16 OZ/500 ML BULLET NOSE ROUND |
| 1 | | 4 CAV | TSNHS | | 4 CAVITY MOLD FOR 32 OZ T-QUART NO HANDLE (SLEEVE) |
| | | 4 CAV | BULLE | | 4 MOLD CAVITIES FOR 16 OZ BULLET NOSE ROUND (UNILOY) |
| | | 3 CAV | DARSL | | 3 MOLD CAVITIES FOR 1/2 GALLON SLEEVE (JODOIN) |
| | | 3 CAV | TALHD | | 3 MOLD CAVITIES FOR 32 OZ/1 LIT T-QUART HANDLE |
| 1 | | 1 CAV | DUALN | | 1 CAVITY MOLD FOR DUAL NECK |
| 1 | | 4 CAV | BULLE | | 4 CAVITY MOLD FOR 8 OZ BULLET |
| | | 4 CAV | CYLIN | | 4 MOLD CAVITIES FOR 32 OZ CYLINDER |
| | | 3 CAV | 6036 | | 3 MOLD CAVITIES FOR 42 OZ OCEAN SPRAY MOLDS |
| | | 2 CAV | 8250 | | 2 MOLD CAVITIES FOR GALLON FLUTED MOLDS |
| ▮ | | ▮▮▮▮ | ▮▮▮ | | ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ |
| | | 3 CAV | ROUND | | 3 MOLD CAVITIES FOR 2-LITER (SUNNY DELIGHT) |
| 1 | | 4 CAV | SQNH | | 4 CAVITY MOLD FOR 16 OZ SQUAT SQUARE |
| | | 5 CAV | HDMF | | 5 MOLD CAVITIES FOR 32 OZ HOOD QUART RD. |
| 1 | | 1 CAV | XCAFE | | 1 CAVITY MOLD FOR X-CAFÉ |
| 1 | | 4 CAV | NN | | 4 CAVITY MOLD FOR 16 OZ NANTUCKET |
| 1 | | 4 CAV | HEX | | 5 CAVITY MOLD FOR 8 OZ HEX PINT |
| 1 | | 4 CAV | NNRD | | 6 CAVITY MOLD FOR 16 OZ NANTUCKET RD |
| 1 | | 4 CAV | LONGN | | 7 CAVITY MOLD FOR 16 OZ LONG NECK |
| 1 | | 4 CAV | LNRD | | 8 CAVITY MOLD FOR 8 OZ/250ML LONG NECK ROUND |
| 1 | | LOT | | | LOT OF OFFICE FURNITURE AND EQUIPMENT INCLUDING BUT NOT LIMITED TO; (12) DESKS, (20) CHAIRS, (15) PC'S, SHELVES, FILING CABINETS AND OTHER MISC OFFICE ITEMS |

| Qty. | Age | Item | Model | Serial No. | Description |
|------|-----|------|-------|-----------|-------------|
| | | | | | MANCHESTER FIXED ASSET SCHEDULE |
| | | | | | LINE #1 |
| 1 | 1999 | ROCHELEAU | RS-25 | RS25-99-09 | BLOW MOLDING MACHINE, 2 HEADS, WITH MTA-G1 CONTROLLER, TRANSFER SHUTTLE & CONVEYOR, HOT KNIFE TRIMMER, FLAME TREATER, TRANSFER CONVEYOR, VACUUM CONVEYOR AND BLOWER, |
| 1 | 20XX | CONAIR | DL | | VACUUM RECEIVER |
| 1 | | DAYTON | | | BLOWER FOR TRIM TO GRINDER ROOM |
| | | | | | OVERHEAD CONVEYOR |
| | | | | | AIR ELEVATOR FOR PARTS TO OVERHEAD CONVEYOR |
| 1 | | | | | ACCUMULATOR TABLE 36" x 48" WITH SEMI-AUTOMATIC BAGGER |
| | | | | | *LINE NOT RUNNING BUT OPERATIONAL* |
| | | | | | LINE #2 |
| 1 | 2001 | ROCHELEAU | RS-25 | RS25-01-26 | BLOW MOLDING MACHINE, 3 HEADS, WITH E-700 CONTROLLER, TRANSFER SHUTTLE & CONVEYOR, HOT KNIFE TRIMMER, FLAME TREATER, SINGLE STATION LEAK DETECTION STATION, TRANSFER CONVEYORS, VACUUM CONVEYOR AND BLOWER, |
| 1 | 20XX | CONAIR | DL | | VACUUM RECEIVER |
| | | | | | OVERHEAD CONVEYOR |
| | | | | | AIR ELEVATOR FOR PARTS TO OVERHEAD CONVEYOR |
| 1 | | | | | ACCUMULATOR TABLE 36" x 48" WITH SEMI-AUTOMATIC BAGGER |
| | | | | | *LINE NOT RUNNING BUT OPERATIONAL* |
| | | | | | LINE #3 |
| 1 | 2003 | ROCHELEAU | RS-25 | RS-25-03-43 | BLOW MOLDING MACHINE, 8 HEADS, WITH E-700 CONTROLLER, TRANSFER SHUTTLE, CONTINUOUS TAIL PULLER, HOT KNIFE TRIMMER, TRANSFER CONVEYORS, VACUUM CONVEYOR AND BLOWER, |
| 1 | 20XX | CONAIR | DL | | VACUUM RECEIVER |
| 1 | 2003 | EMHART POWERS | 975DR | 4186 | SINGLE STATION LEAK DETECTION STATION |
| 1 | | CUSTOM AUTOMATION | | | ACCUMULATOR TABLE 32" x 32" WITH SEMI-AUTOMATIC BAGGER AND LIGHT TABLE INSPECTION STATION |
| | | | | | LINE #4 |
| 1 | 1999 | ROCHELEAU | RS-25 | RS25-99-16 | BLOW MOLDING MACHINE, 8 HEADS, WITH MTA-G1 CONTROLLER, TRANSFER SHUTTLE, HOT KNIFE TRIMMER, FLAME TREATER, TRANSFER CONVEYORS |
| 1 | 20XX | CONAIR | DL | | VACUUM RECEIVER |
| 2 | | EMI | KK1-9-11-4-20 | AB1245 | CONVEYORS TO GRINDER |
| 1 | 20XX | CUMBERLAND | 10 x 18 | CG-0260-99511 | GRINDER 10" x 18", 7.5 HP |
| 1 | 200X | EMHART POWERS | 975DR | 4094 | SINGLE STATION LEAK DETECTION STATION |
| 1 | | | | | FLAME TREATER, 10 x 48 |
| 1 | 2010 | EMI | KK1-12-7-6-20 | AB1478 | CONVEYOR, HORIZONTAL TO INCLINE |
| | | | | | *LINE NOT RUNNING WAS UNDERGOING MOLD CHANGE* |
| | | | | | LINE #5 |
| 1 | 9X | UNILOY | 350RZ | 350R22793 | BLOW MOLDING MACHINE, 4 HEAD, ORIGINAL RELAY CONTROLS UPGRADES TO DIGITAL, HORIZONTAL TAKEOUT CONVEYOR AND TRIMMER, TRANSFER CONVEYORS, VACUUM CONVEYOR AND BLOWER, |
| 1 | | IDEAS IN MOTION | QT2103 | 2035 | SINGLE STATION LEAK DETECTION STATION |
| 1 | | CUSTOM METAL DESIGN | | | BOTTLE CONVEYOR |
| 1 | | CONAIR | DL | | VACUUM RECEIVER |
| 1 | | CUSTOM METAL DESIGN | | | ACCUMULATOR TABLE 40" x 50" WITH SEMI-AUTOMATIC BAGGER AND DUAL LIGHT TABLE INSPECTION STATION |
| 1 | 20XX | SARTORIAN | EA6DCE-1 | 9071004 | DIGITAL SCALE, 8" x 10" PLATFORM, 6KG MAX |
| | | | | | LINE #6 |
| 1 | 2010 | VELOCITY | BM526 | | BLOW MOLDING MACHINE, 12 HEAD, VACUUM CONVEYOR AND BLOWER, |
| 1 | 2003 | EMHART | 975D3L | 4195 | SINGLE STATION LEAK DETECTION STATION |
| 1 | | CONAIR | DL | | VACUUM RECEIVER WITH BUNTING MAGNET |
| | | | | | LINE #7 |
| 1 | 2004 | ROCHELEAU | RS-25 | RS25-04-09 | BLOW MOLDING MACHINE, 8 HEADS, WITH E-700 CONTROLLER, TRANSFER SHUTTLE, HOT KNIFE TRIMMER, FLAME TREATER, TRANSFER CONVEYORS |
| 1 | 2002 | ROCHELEAU | ST-24-28 | ST-04-24 | TRIM STATION |
| 1 | 2009 | EMHART POWERS | 97501R | 4218 | SINGLE STATION LEAK DETECTION STATION |
| 1 | | CONAIR | DL | | VACUUM RECEIVER |
| | | | | | INLINE/OFFLINE SLEEVE LABELING SYSTEM |
| 1 | | | | | INLINE BOTTLE FEED CONVEYOR SYSTEM FROM LINE 6 & 7, WITH INSPECTION STATION, DIVERTER TO DIVERT BOTTLES INTO GAYLORDS OR SEND TO INLINE SLEEVE SHRINK LABELER SYSTEM |
| 1 | | PACE BOTTLE HANDLING SYSTEMS | M400 | 1140 | BOTTLE FEED SYSTEM TO TAKE BOTTLES FROM MANUALLY FILLED HOPPER AND ORIENT THEM TO FEED INTO THE PDC INTERNATIONAL SLEEVE LABELER |
| 1 | | PDC INTERNATIONAL | R300SWERT | 079 | SLEEVE LABELER, FEEDS, CUTS AND POSITIONS SLEEVE LABELS ONTO BOTTLES |

BLOW MOLDING

| Qty. | Age | Item | Model | Serial No. | Description |
|---|---|---|---|---|---|
| 3 | | PDC INTERNATIONAL | BDL 102 | 134, 205, 208 | HEAT TUNNELS FOR SHRINKING SLEEVES ONTO BOTTLES |
| 1 | | KEYENCE | CV2100M | | VISION SYSTEM FOR CHECKING BOTTLE NECK CONCENTRICITY |
| | | | | | OFFLINE SLEEVE LABELING SYSTEM |
| 1 | | PACE BOTTLE HANDLING SYSTEMS | M400 | 2056 | BOTTLE FEED SYSTEM TO TAKE BOTTLES FROM MANUALLY FILLED HOPPER AND ORIENT THEM TO FEED INTO THE PDC INTERNATIONAL SLEEVE LABELER |
| 1 | | PDC INTERNATIONAL | R300TSASER | 095 | SLEEVE LABELER, FEEDS, CUTS AND POSITIONS SLEEVE LABELS ONTO BOTTLES |
| 3 | 20XX | PDC INTERNATIONAL | (2) KRC-1846510 KRC-1846510 | 373, 365 274 | HEAT TUNNELS FOR SHRINKING SLEEVES ONTO BOTTLES |
| 1 | | KEYENCE | CV2100M | | VISION SYSTEM FOR CHECKING BOTTLE NECK CONCENTRICITY |
| 1 | 2010 | SULLAIR | 5507V-A | 201010150037 | AIR COMPRESSOR, 75HP, 110 PSI MAX, WS CONTROLLER |
| 1 | 2010 | MANCHESTER | 203422 | 198 | AIR TANK, 400 GALLON |
| 1 | 2010 | ZEKS | 400HSGA400 | 525406 | AIR DRYER, 300PSI, 1 HP REFRIGERANT COMPRESSOR |
| | | | | | |
| 6 | 2011 | AEC | GPAC-105 | 41C0052 41C0071    41C0072 41C0073 41C0074 41C0075 | CHILLER, AIR COOLER, OUTDOOR, 15HP PROCESS PUMP, 2 HP COMPRESSOR |
| 1 | | CONAIR | WSB-140 | 102969-20 | BLENDER, 4 COMPONENT WITH (2) CONAIR DL RECEIVERS AND 3 PORT TAKE OFF |
| 1 | 20XX | CONAIR | D-10-40 | 66796 | MATERIAL LOADING STATION CONTROLS - 24 STATION |
| 3 | 20XX | CONAIR | | | VACUUM FILTERS |
| 1 | | CONAIR | | | CYCLONE RECEIVER FROM ROOTS PUMPS WITH 1200 LB SURGE DAY BIN WITH TAKE OFF OR GAYLORD DROP |
| 2 | | CONAIR | | 700-016-10-1-1155 700-219-4B-1207 | VACUUM PUMPS, 5 HP, ROOTS TYPE WITH SILENCERS |
| 3 | | CINCINNATI FAN | SQBI | 115737-1 115737-2    11738-2 | BLOWERS, 5 HP |
| 1 | 9X | MAGUIRE | WSB-940 | 81813 | BLENDER 5 COMPONENT WITH CONAIR DL LOADERS |
| 1 | 1996 | MAGUIRE | WSB-440 | 82756 | BLENDER 4 COMPONENT WITH CONAIR DL LOADERS |
| 2 | | NBE | | | SURGE BIN, 2500 & 1000 LB WITH CYCLONE LOADERS |
| 3 | | SOLBERG | DFC804A-7 | | MATERIAL VACUUM PUMPS (NOT CURRENTLY INSTALLED) |
| 2 | | A. O. SMITH INDUSTRIAL TANK | | | MATERIAL SILOS, BOLTED, 15 x 24 HIGH |
| | | | | | |
| 1 | 20XX | FOREMOST | HD-66 | 135531 | GRANULATOR 15 x 18, 15HP, WITH MATERIAL VACUUM BLOWER |
| 1 | 9X | FOREMOST | HD-6 | 14770 | GRANULATOR 15 x 18, 15HP, WITH MATERIAL VACUUM BLOWER |
| 1 | 3 | CUMBERLAND | | 82100-03303 | GRANULATOR, 16 x 16, 15HP, WITH MATERIAL VACUUM BLOWER |
| 1 | 2000 | CUMBERLAND | | 82100-00503 | GRANULATOR, 16 x 16, 15HP, WITH MATERIAL VACUUM BLOWER |
| 1 | 1985 | RAPID | 6K4535 | 120-278 | GRANULATOR, 20 x 24, 30 HP, TANGENTIAL FEED |
| 1 | 8X | EMI | KK-1-9-6-4-20 | AB1231 | CONVEYOR |
| 1 | 20XX | EMI | STLC-9-7-20 | 8-12130 | CONVEYOR 7" x 9' |
| 1 | 20XX | EMI | RMC-12-9-20 | M-13250 | CONVEYOR |
| 20 | | | | | PALLET RACKS |
| 1 | 20XX | OHAUS | T-32ME | B000020JBQ | FLOOR SCALE, 48" PLATFORM, 6000 LBS MAX |
| 1 | 20XX | ITW | SV-11 | D0321003 | STRETCH WRAPPER, 60" DIA PLATFORM, 7' HIGH |
| 1 | | | | | LOT OF MAINTENANCE EQUIPMENT INCLUDING BUT NOT LIMITED TO; |
| 1 | 2013 | ARIENS | 926104 | 3537332 | SNOWBLOWER, GAS |
| 1 | 20XX | TORO | 38272418ZR | 312616022 | SNOWBLOWER, GAS |
| 1 | 9X | MILLER | 185 | TK174655903497 | MILLERMATIC 185 MIG WELDER |
| 1 | | | | | (2) DAYTON BELT/DISC SANDERS, (2) 15" DRILL PRESSES, CRAFTSMAN BAND SAW, DAYTON BENCH GRINDER, FLAMMABLE STORAGE CABINET, OXY-ACETYLENE WELDER, MILLER ARC WELDER, DEWALT POWER WASHER, SCISSOR LIFT MOLD TABLE |
| 5 | | | | | PALLET JACKS |
| 1 | 9X | TOYOTA | 8FGU15 | 31924 | FORKLIFT TRUCK, 4000 LB, WAS NOT PRESENT, UNIT WAS JUST REBUILT AND NOT BACK AT PLANT YET (CUSTOMER WAS USING A RENTED FORKLIFT AT THE MOMENT) |
| 1 | | 4 CAVITY | | | 4 CAVITY DAIRY TALL HANDLE QUART BOTTLE MOLD SET |
| 1 | | 6 CAVITY | | | 6 CAVITY STANDARD INDUSTRIAL ROUND BOTTLE MOLD SET |
| 1 | | 6 CAVITY | | | 6 CAVITY STANDARD INDUSTRIAL SQUARE BOTTLE MOLD SET |
| 1 | | 8 CAVITY | | | 8 CAVITY STANDARD MUSTARD 9 OZ BOTTLE MOLD SET |
| 1 | | 8 CAVITY | | | 9 CAVITY STANDARD MUSTARD 16-20-24 OZ CONVERTIBLE BOTTLE MOLD SET |
| 1 | | 3 CAVITY | | | 3 CAVITY STANDARD ROUND WIDE MOUTH GALLON CONTAINER MOLD SET |

BLOW MOLDING

| Qty. | Age | Item | Model | Serial No. | Description |
|------|-----|------|-------|-----------|-------------|
| 1 | | 3 CAVITY | | | 4 CAVITY STANDARD SQUARE WIDE MOUTH GALLON CONTAINER MOLD SET |
| 1 | | 8 CAVITY | | | 8 CAVITY STANDARD 12 OZ GAS ADDITIVE BOTTLE MOLD SET |
| █ | | ████████ | | | ████████████████████████████████████████████████ |
| 1 | | 8 CAVITY | | | 8 CAVITY STANDARD 10 OZ DECANTER SINGLE SERVE DAIRY BOTTLE MOLD SET |
| 1 | | LOT | | | LOT OF SPARE BACKING PLATES, MOLD PARTS, (24) NECK FINISH MOLDS |
| 1 | | | | | LOT OF OFFICE EQUIPMENT INCLUDING BUT NOT LIMITED TO; (7) OFFICES WITH DESKS AND PC'S, (3) OFFICES WITH DESKS, (1) CONFERENCE TABLE AND (8) CHAIRS, (1) DESIGNJET LARGE FORMAT PRINTER 750C PLUS, (5) MODULAR OFFICES, PHONE SYSTEM AND NETWORK, MISC TABLES AND CHAIRS |

BLOW MOLDING

| | | | | | MONTICELLO FIXED ASSET SCHEDULE |
|---|---|---|---|---|---|
| Qty. | Age | Item | Model | Serial No. | Description |
| 2 | 1995 | MAG PLASTIC (SWISS) | SSB20 | 2279, N/A | REHEAT & BLOW PET BLOW MOLDING MACHINES, 2000 BPH ON 1/2 LITER BOTTLES, BLOWING AT 450-500 PSI, WITH PREFORM DUMPERS & COOLING CONVEYORS. NOT RUNNING BUT OPERATIONAL. |
| 1 | 1982 | INGERSOLL RAND | 479 | W6RF-NBS | 40 HP 500PSI HIGH PRESSURE COMPRESSOR |
| 1 | 1999 | UNILOY | 350R2 | 5215 | RECIPROCATING BLOW MOLDING MACHINE, 6 HEADS (SET UP FOR QUARTS), WITH 1999 LOWBOY TRIMMER S/N 5215B, LT2 LEAK DETECTOR. APPEARS COMPLETE, DRIVE MOTOR OUT FOR REPAIR, NOT YET IN SERVICE. |
| 1 | 198X | ROCHELEAU | SPB-9 | SPB23-23 | RECIPROCATING BLOW MOLDING MACHINE, SINGLE HEAD. NOT IN SERVICE, NEEDS DRIVE MOTOR AND PISTON. |
| 1 | 197X | UNILOY | 250R1 | SPT2880 | RECIPROCATING BLOW MOLDING MACHINE, 5 HEAD, WITH COOLING BED. NOT IN SERVICE BUT APPEARS COMPLETE EXCEPT FOR DRIVE MOTOR. |
| 1 | 196X | UNILOY | 5710 | 2234 | RECIPROCATING BLOW MOLDING MACHINE, 4 HEAD, WITH INLINE TRIMMER. MISSING DRIVE MOTOR. |
| 1 | 199X | SULLAIR | 44331 | 590471 | AIR COMPRESSOR, 40 HP, SCREW TYPE, AIR COOLED |
| 1 | 199X | MOTIVAIR | | | AIR DRYER |
| 1 | 199X | TANK | | | AIR RECEIVING TANK, 100 GALLONS |
| 1 | 199X | MOTIVAIR | | | AIR DRYER, NOT IN SERVICE, APPEARS COMPLETE |
| 1 | 199X | THERMAL CARE | | | CHILLER, 30 TON, NOT IN SERVICE, REPORTEDLY OPERATIONAL |
| 1 | 198X | LINCOLN | | | IDEALARC, ARC WELDER ON CART |
| 1 | | LOT | | | LOT OF TOOL ROOM EQUIPMENT, INCLUDING BUT NOT LIMITED TO: BENCH GRINDER, STEEL WORK BENCH, SPOT LIGHTING, RACKS, BINS AND CABINETS. |
| 1 | 199X | CROWN | | | LIFT, BATTERY OPERATED, 3000 LB, NEEDS BATTERY |
| 1 | | LOT | | | LOT OF MISCELLANEOUS MOTORS AND PUMPS, USED & STORED IN GAYLORDS. |
| 1 | | LOT | | | LOT OF MISCELLANEOUS EQUIPMENT STORED IN OUTDOOR CONTAINER. NOT FULLY INSPECTED, INCLUDING BUT NOT LIMITED TO; CUMBERLAND 10X12 GRINDER, FORKLIFT GUARDS, SEVERAL EMI & TEC CONVEYORS, FOREMOST GRINDER, TRANE AIR HANDLERS, CONAIR HOPPER & MIXERS, RADIANT OPTICS HEATERS, AND OTHER MISC EQUIPMENT. FULL LIST IN WORK FILE. |
| 7 | | DAIRY MOLDS | | | MOLDS, 1/2 GALLON DAIRY MOLD FOR UNILOY |
| 1 | | LOT | | | LOT OF PET BOTTLE MOLDS INCLUDING BUT NOT LIMITED TO APPROXIMATELY 24 CAVITIES FOR PET BEVERAGE BOTTLE MOLDS FOR MAGS REHEAT/BLOW MACHINES* |

*Excluding a 2 cavity 12 oz. pet bottle mold belonging to Ronny Brook

Schedule 1.01(b)

Real Property Lease between Plastic Technologies of Vermont, Inc. d/b/a Shelburne Plastics and Mark Hill Investments, Inc.

Supply Contract between Plastic Technologies of Vermont, Inc. and Verger Paul Jodoin, Inc.

Supply Contract between Shelburne Plastics and Berlin Packaging

Supply Contract between Plastic Technologies of New York, LLC, d/b/a Shelburne Plastics and Farmland Dairies

Supply Contract between Plastic Technologies of Vermont, Inc. and Stonyfield Farm, Inc.[1]

Operating Lease between Shelburne Plastics and Pitney Bowes for VT Postage Meter

Operating Lease between Shelburne Plastics and Toyota Financial Commercial Services for NH Forklift

Capital Lease between Plastic Technologies of Vermont, Inc. and North Star Leasing for VT AC Drive

Capital Lease between Plastic Technologies of Vermont, Inc. and North Star Leasing for VT Lighting Project

Capital Lease between Plastic Technologies of Vermont, Inc. and North Star Leasing for VT Labeling Equipment

Capital Lease between Plastic Technologies of Vermont, Inc. d/b/a Shelburne Plastics and Air Molded Plastics for VT RS-25 Blowmold Machine

---

[1] Stonyfield Farm, Inc. issued a Notice of Termination to Plastic Technologies of Vermont, Inc. on October 18, 2013.

Schedule 1.02(d)

All cash, including cash in TD Bank and Centrix Bank checking accounts, People's payroll account, petty cash and investments.

All prepaid taxes, insurance, rent, interest and expenses

All land and buildings

All non-compete agreements

All organization costs

All security deposits

All refinance costs

<u>Schedule 1.01(g)</u>

See Attached

**shelburne
plastics**

PACKAGING AND PLASTIC SOLUTIONS

<u>Schedule 4.03</u>

None

<u>Schedule 4.04</u>

The following parties have a lien, interest or encumbrance in certain of the Acquired Assets:

Centrix Bank

Internal Revenue Service

NS Leasing LLC

Business Finance Authority of New Hampshire

Toyota Motor Credit Corporation

AEC, Inc.

Grenier Center LLC

<u>Schedule 4.05</u>

Air Molded Products Corp. v. Plastic Technologies of Vermont, Inc., dba Shelburne Plastics, and Gene Torvend, Superior Court of New Jersey, Law Division, Ocean County, Docket No. OCN-L-001894-13.  See attached Stipulation of Settlement

# SENDZIK & SENDZIK
## A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW
1808 ROUTE 88, BRICK, NEW JERSEY 08724
(732)840-6464 · (732)840-0009 TELEFAX
SENDZIKLAW@COMCAST.NET

JAY C. SENDZIK                                                    KATE SENDZIK HAINES
MEMBER OF NJ AND PA BARS                                          MEMBER OF NJ BAR

TO:      Plastic Technologies of Vermont, Inc. dba Shelburne Plastics –
         Attn: John Mayer, CFO

FROM:    Jay C. Sendzik, Esq.

FAX NO:  802-660-2537

RE:      Air Molded Products Corp. vs. Plastic Technologies of Vermont, Inc.
         dba Shelburne Plastics and Gene Torvend

CC:


DATED: July 30, 2013  PAGES - 5- INCLUDING THIS COVER PAGE

ADDITIONAL NOTES:


CONFIDENTIALITY NOTE:   The document(s) accompanying this telecopy transmission contains information from Sendzik & Sendzik, P.C. which is confidential and/or legally privileged. The information is intended only for the use of the individual or entity named in this transmission sheet. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or taking of any action in reliance upon the contents of this telecopied information is strictly prohibited and the document(s) should be returned to this firm immediately. If you have received this telecopy in error, please notify use by telephone immediately so that arrangements can be made for the return of the original documents to this office at no cost to you.


IF YOU DO NOT RECEIVE ALL OF THE PAGES INDICATED, PLEASE
CONTACT THE OFFICE AT 732-840-6464.

# SENDZIK & SENDZIK

## A PROFESSIONAL CORPORATION
### ATTORNEYS AT LAW
1808 ROUTE 88, BRICK, NEW JERSEY 08724
(732)840-6464 · (732)840-0009 TELEFAX
SENDZIKLAW@COMCAST.NET

JAY C. SENDZIK
MEMBER OF NJ AND PA BARS

KATE SENDZIK HAINES
MEMBER OF NJ BAR

July 30, 2013

Plastic Technologies of Vermont, Inc.
dba Shelburne Plastics
8 Harborview Road
South Burlington, Vermont 05403

Attn:  John Mayer, CFO

Re:   Air Molded Products Corp. vs. Plastic Technologies of Vermont, Inc.
dba Shelburne Plastics and Gene Torvend

Dear Mr. Mayer:

Douglas Frank informed me than an amicable resolution of the above matter has been agreed upon and directed this office to prepare a Stipulation of Settlement embodying those understandings. Enclosed is an original and one (1) copy of a proposed Stipulation of Settlement for your review and signature in addition to the appropriate attestation and witness.

If you have any questions, please contact me. If not, please return both signed copies to be filed with the Court. A filed copy will be returned for your records.

Thank you.

Very truly yours,
Sendzik & Sendzik, P.C.

By:   _____
JAY C. SENDZIK, ESQ.

JCS/lg
Encl.

VIA REGULAR MAIL & TELEFAX (802)660-2537

cc:   Air Molded Products Corp. – Attn: Douglas Frank (w/encl.)

SENDZIK & SENDZIK, P.C.
1808 ROUTE 88
BRICK, NEW JERSEY 08724
(732)840-6464
Attorney for Plaintiff, Air Molded Products Corp.

| | |
|---|---|
| AIR MOLDED PRODUCTS CORP., | SUPERIOR COURT OF NEW JERSEY |
| : | LAW DIVISION |
| Plaintiff, : | OCEAN COUNTY |
| : | |
| -v- : | DOCKET NO. OCN-L-001894-13 |
| : | |
| PLASTIC TECHNOLOGIES OF : | Civil Action |
| VERMONT, INC., DBA SHELBURNE : | |
| PLASTICS, AND GENE TORVEND, : | STIPULATION OF SETTLEMENT |
| : | |
| Defendants. : | |

IT IS hereby stipulated by and between the Plaintiff, Air Molded Products Corp., through its counsel, Jay C. Sendzik, Esq. of the firm of Sendzik & Sendzik, P.C. and the Defendants, Plastic Technologies of Vermont, Inc. dba Shelburne Plastics and Gene Torvend, that the above captioned matter, as well as any and all claims, complaints, counter-claims, cross-claims and suits between the parties hereto has been settled as follows:

    1.    Defendants, Plastic Technologies of Vermont, Inc. dba Shelburne Plastics and Gene Torvend shall unconditionally pay to the Plaintiff, Air Molded Products Corp., and Plaintiff, Air Molded Products Corp. shall accept from the Defendants, Plastic Technologies of Vermont, Inc. dba Shelburne Plastics and Gene Torvend the sum of Twenty Eight Thousand Two Hundred Eighty Six Dollars and Eighty Eight Cents ($28,286.88) which represents Eighteen Thousand Nine Hundred Eighty Six Dollars and Eighty Eight Cents ($18,986.88), the outstanding amount due and owing on the Lease Agreement (Equipment) between the Defendant, Plastic Technologies of Vermont, Inc. dba Shelburne Plastics and Gene Torvend to the Plaintiff, Air Molded Corp., the amount of Five Thousand Three Hundred Dollars ($5,300.00) representing late charges due under the

Lease Agreement and Four Thousand Dollars ($4,0000.00) representing Plaintiff's counsel fees and costs, payable in the following manner:

    A.    Defendants, Plastic Technologies of Vermont, Inc. dba Shelburne Plastics and Gene Torvend shall pay Plaintiff, Air Molded Products Corp., the amount of One Thousand Dollars ($1,000.00) on or before August 15, 2013;

    B.    Defendants, Plastic Technologies of Vermont, Inc. dba Shelburne Plastics and Gene Torvend shall continue to pay Plaintiff, Air Molded Products Corp. the amount of One Thousand Dollars ($1,000.00) on or before the 15th of every month thereafter through November 15, 2016 with the final payment of Two Hundred Eighty Six Dollars and Eighty Eight Cents ($286.88) due by December 15, 2016; and,

    C.    Payment shall be made to Air Molded Products Corp. c/o Douglas Frank, 365 Aldo Drive, Toms River, New Jersey 08753.

    2.    Failure to make payments as stipulated herein will result in a judgment being entered in favor of the Plaintiff, Air Molded Products Corp. in the amount of Twenty Eight Thousand Two Hundred Eight Six Dollars and Eighty Eight Cents ($28,286.88) plus interest, costs and counsel fees, less credit to the Defendants for all payments made to the Plaintiff. Judgment will be entered without notice to Defendants upon application and affidavit by the Plaintiff.

    3.    In the event judgment is entered, Defendants agree to voluntarily surrender the equipment which is subject of the Lease Agreement to the Plaintiff, and/or its agents(s), representatives(s) and/or assign(s). Any amounts received by the Plaintiff through sale or salvage shall be credited against the amount owed to Plaintiff.

    4.    Defendants shall be responsible for any costs, or counsel fees incurred by the Plaintiff for Defendants failure to comply as stipulated herein. Any costs or counsel fees incurred as a result thereof shall be added to the judgment, or become a separate judgment in the same manner as setforth in paragraph 2 herein above.

    5.    Defendants may pre-pay the full amount, or any portion thereof without penalty.

6. After the final check clears, and/or the judgment(s) is(are) satisfied, Plaintiff shall deliver to Defendants a duly Stipulation of Dismissal with Prejudice.

Sendzik & Sendzik, P.C.
1808 Route 88
Brick, New Jersey
Attorney for Plaintiff, Air Molded Products Corp.

By:_____  Date:
    JAY C. SENDZIK, ESQ.

Plastic Technologies of Vermont, Inc.
dba Shelburne Plastics, Defendant

By:_____  Attest:
    JOHN MAYER, CFO

Date:

_____  Witness:
GENE TORVEND

Date:

UNITED STATES BANKRUPTCY COURT
DISTRICT OF VERMONT

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF VERMONT, INC. | ) | Case No.  13-10729- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF MARYLAND, INC. | ) | Case No.  13-10730- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |

_____

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| PLASTIC TECHNOLOGIES OF NEW YORK, LLC | ) | Case No.  13-10731- cab |
| | ) | *Chapter 11 case* |
| Debtor in Possession. | ) | |
| | | *Pending Joint Administration* |

---

**ORDER APPROVING DEBTORS' SALE OF SUBSTANTIALLY ALL
ASSETS FREE AND CLEAR OF INTERESTS AND ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES**

---

On October 21, 2013, Plastic Technologies of Vermont, Inc., Plastic Technologies of Maryland, Inc., and Plastic Technologies of New York, LLC (collectively, "Debtors" or "Sellers") filed a motion (the "Motion")[1] for an order approving sale (the "Sale") of substantially all Debtors' assets (the "Acquired Assets") free and clear of all interests and assumption and assignment of certain executory contracts and unexpired leases to Consolidated Container Company, LP ("Stalking Horse" or "Purchaser") and related relief.  On October 22, 2013, this Court granted other relief requested in the Motion, including the procedures for bidding and

_____

[1] Any capitalized terms not defined herein shall have the meaning given to them in the Motion.

EXHIBIT "C"

auction of the Acquired Assets (the "Auction").  After hearing on November 19, 2013 (the "Sale Hearing") and consideration of the results of the Auction held on November 18, 2013 and the objections filed by _____, this Court has determined that granting the remaining relief requested in the Motion is in the best interests of Debtors, their estates, creditors and other parties in interest, and is a proper exercise of Debtors' business judgment.  It appears that proper and adequate notice of the Motion has been given, no other or further notice is necessary, and good and sufficient cause for this Order has been shown.  Accordingly, it is hereby FOUND THAT:

a.      This Court has jurisdiction over the above-captioned cases, this proceeding and all of Debtors' property, including the Acquired Assets to be sold, pursuant to 28 U.S.C. §§ 1334 and 157.  This is a core proceeding.  Venue of Debtors' cases and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).

b.      The statutory predicates for the relief sought in the Motion and the basis for the approvals and authorizations contained in this Order are (i) Sections 105(a), 363 and 365 of the Bankruptcy Code and (ii) Bankruptcy Rules 2002, 6004, 6006, and 9014.

c.      Proper, adequate, and sufficient notice of the Motion and Stalking Horse APA have been provided in accordance with Sections 363 and 365 of the Bankruptcy Code and in compliance with Bankruptcy Rules 2002, 6004, 6006, and 9014, the local rules of this Court and the procedural due process requirements of the United States Constitution.  A reasonable opportunity to object or be heard regarding the requested relief has been afforded to all interested parties.

d.      Debtors provided due and proper notice of the assumption and assignment of the Assumed Contracts to each counterparty of an Assumed Contract (as defined in the Stalking

Horse APA and identified in Schedule 1.01(b) thereto).   No other or further notice of the Motion, Sale or assumption and assignment of the Assumed Contracts (including with respect to the payment of any cure amounts due thereunder) is necessary.

e.      Debtors have demonstrated a sufficient basis to enter into the Stalking Horse APA, attached hereto as Exhibit A, to sell the Acquired Assets, and to assume and assign the Assumed Contracts under Sections 363 and 365 of the Bankruptcy Code.   Such actions are appropriate exercises of Debtors' business judgment and in the best interests of Debtors, their estates and their creditors.

f.      Debtors concluded that absent an immediate sale of the Acquired Assets, Debtors would have to close their business and liquidate their assets, which liquidation would substantially impair the value of the Acquired Assets.  Debtors' equipment and other assets are specifically used and designed for their customers and, thus, a liquidation of Debtors' assets, without assumption and assignment of customer contracts, would significantly reduce Debtors' proceeds.

g.      As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through a bidding and auction process, Debtors and their professionals have complied, in good faith, in all material respects with the Bidding Procedures Order and have (a) afforded interested potential purchasers a full, fair, and reasonable opportunity to qualify as Qualified Bidders and submit their highest or  best offer to purchase the Acquired Assets at the Auction and (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Acquired Assets. The Bidding Procedures were non-collusive, substantively and procedurally fair to all parties and were reasonable and appropriate.

h.      Purchaser is a buyer in good faith, as that term is used in Section 363(m) of the Bankruptcy Code.  The Stalking Horse APA was negotiated and entered into in good faith, based on arm's length bargaining, and without collusion or fraud of any kind.  Based on the record before this Court, neither Debtors nor Purchaser engaged in any conduct that would prevent application of Section 363(m) of the Bankruptcy Code.  Purchaser is therefore entitled to all of the protections of Section 363(m) of the Bankruptcy Code.

i.      Debtors have full power and authority to enter into the documents contemplated by the Stalking Horse APA and the Sale has been authorized and approved in accordance with the requirements of state law and respective internal governance requirements.  Other than as may be expressly provided for in the Stalking Horse APA, no further consents or approvals are required.

j.      Section 363(f) of the Bankruptcy Code provides for the sale of the Acquired Assets free and clear of any interest in such property.  Those (i) holders of any liens, claims, interests or encumbrances in or on the Acquired Assets and (ii) non-Debtor parties, who did not object, or who withdrew their objections, to the Motion are deemed to have consented pursuant to Section 363(f)(2) of the Bankruptcy Code.  All objections to the Motion have been resolved or withdrawn or overruled. Those holders of any liens, claims, interests or encumbrances in or on the Acquired Assets who did object fall within one or more of the other subsections of Section 363(f) of the Bankruptcy Code and are adequately protected by having their liens, claims, interests or encumbrances, if any, attach to the Sale proceeds.

k.      Debtors may transfer the Acquired Assets to Purchaser free and clear of all liens, claims, interests or encumbrances because, in each case, one or more of the standards set forth in Section 363(f) of the Bankruptcy Code have been satisfied.  All liens, claims, interests and encumbrances in or on the Acquired Assets shall attach to the Sale proceeds with the same

4

priority, validity, force, and effect that they now have, if any, as against the Acquired Assets and subject to any claims and defenses Debtors or other parties may possess with respect thereto. All persons having any lien, claim, interest or encumbrance of any kind or nature whatsoever against or in Debtors or the Acquired Assets shall be forever barred, estopped and permanently enjoined from asserting the same against Purchaser, any of Purchaser's assets (including, without limitation, the Acquired Assets), property, successors or assigns.

l.      Time is of the essence in consummating the Sale. To effectuate the terms of the Stalking Horse APA, it is essential that the Sale occur as soon as possible. Accordingly, there is cause to lift the fourteen (14) day stay imposed by Bankruptcy Rules 6004 and 6006.

m.      Based upon the foregoing findings and conclusions, and upon the record made before this Court at the Sale Hearing, and good and sufficient cause appearing therefore;

IT IS HEREBY ORDERED AS FOLLOWS:

1.      The Motion is GRANTED. The Sale, including all terms of the Stalking Horse APA, which is fully incorporated herein, is approved. Debtors and Purchaser are hereby authorized and directed to perform and complete all obligations and acts necessary to carry out the Sale and terms of the Stalking Horse APA.

2.      All objections and responses to the Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing. If any objection or response was not otherwise withdrawn, waived, or settled, it, and any reservation of rights contained therein, is overruled and denied.

3.      Notice of the Sale Hearing was fair and appropriate under the circumstances and complied in all respects with Bankruptcy Rules 2002, 4001, 6004 and 6006.

4.      Notwithstanding Bankruptcy Rules 6004 and 6006, this Order shall be effective and enforceable immediately upon entry.

5.      Purchaser is a "good faith" purchaser entitled to the protections of Section 363(m) of the Bankruptcy Code.

6.      The Acquired Assets shall be transferred to Purchaser free and clear of all liens, claims and encumbrances in or on the Acquired Assets in accordance with Section 363(f) of the Bankruptcy Code.

7.      Purchaser has provided adequate assurance of future performance under the Assumed Contracts.  The assumption by Debtors and assignment to Purchaser of the Assumed Contracts is authorized and approved pursuant to Sections 363 and 365 of the Bankruptcy Code. The Assumed Contracts shall be deemed valid and binding and in full force and effect.  Purchaser shall be liable for all obligations under such Assumed Contracts arising on and after closing of the Sale.

8.      Debtors shall promptly pay to counterparties of Assumed Contracts the amounts set forth by Debtors on the corresponding Cure Notices, or as amended by mutual agreement of Debtors and counterparties to Assumed Contracts or the Court (the "Final Cure Costs").  The Final Cure Costs are fixed and counterparties to the Assumed Contracts are forever bound by such Final Cure Costs and forever barred, estopped, and permanently enjoined from asserting any other amounts under such Assumed Contracts against Debtors and their estates.

9.      At closing of the Sale, the net proceeds of the Sale shall be paid to Bank subject to the Carve-Out and the rights of parties in interest to challenge Bank's lien under the terms of Debtors' debtor-in-possession financing order.

6

10. In the event of an Alternative Transaction, the Break-Up Fee shall be paid as an administrative expense to Purchaser within one business day of the Sale closing. The Break-Up shall be paid to Purchaser directly from the Sale proceeds free and clear of any lien, claim, interest or encumbrance, including any lien, claim, interest or encumbrance of Centrix Bank.

11. The provisions of this Order shall be self-executing. Debtors and Purchaser are hereby authorized but not directed, to execute or file releases, termination statements, assignments, consents, or other instruments they deem necessary to implement the provisions of this Order and incorporated Stalking Horse APA.

12. This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order in all respects and to decide any disputes concerning this Order, the Stalking Horse APA or any issues related thereto.

13. The provisions of this Order and any actions taken pursuant hereto shall survive entry of any order which may be entered dismissing or closing Debtors' cases.

**SO ORDERED**

**Dated: _____**

_____
**The Honorable Colleen A. Brown
United States Bankruptcy Judge**